UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VR OPTICS, LLC,

          Plaintiff,

   -v-

PELOTON INTERACTIVE, INC.,

          Defendant.

---

PELOTON INTERACTIVE, INC.,

        Third-Party Plaintiff,

   -v-

VILLENCY DESIGN GROUP, LLC, ERIC VILLENCY, and JOSEPH COFFEY,

       Third-Party Defendants.

16-CV-6392 (JPO)

MEMORANDUM AND ORDER

---

J. PAUL OETKEN, District Judge:

  This is a patent infringement case involving interactive exercise equipment. Plaintiff VR Optics, LLC ("VR Optics") brings claims of patent infringement against Defendant Peloton Interactive, Inc. ("Peloton"), and Peloton asserts counterclaims of patent invalidity and tortious interference with contract against VR Optics, as well as various state law contract and tort claims against Third-Party Defendants Villency Design Group, LLC ("VDG"), Eric Villency, and Joseph Coffey (all together with VR Optics, "VRO/VDG").[1] Further familiarity with this case is presumed based on this Court's prior opinions in this action. *See, e.g.*, *VR Optics, LLC v.*

---

[1] Third-Party Defendants Villency and Coffey are alleged to be owners and controllers of both VR Optics and VDG. (Dkt. No. 17 ¶¶ 24–25.)

1

*Peloton Interactive, Inc.*, 345 F. Supp. 3d 394 (S.D.N.Y. 2018); *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16 Civ. 6392, 2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017).

Now pending before the Court are three motions to compel (Dkt. Nos. 130, 137, 143), as well as a number of motions for leave to file portions of the motion-to-compel briefing under seal (Dkt. Nos. 138, 140, 142, 144, 148, 150; *see also* Dkt. Nos. 131, 133, 135 (motions for leave to file under seal previously granted by the Court in connection with the instant motions to compel)). The Court addresses each motion in turn.

## I. VRO/VDG's Motion to Compel Peloton's Production of Documents Withheld as Privileged (Dkt. No. 130)

VRO/VDG move to compel the production of certain documents withheld as privileged by Peloton. Specifically, VRO/VDG seek to compel Peloton to produce "all documents reflecting [Peloton's] communications with Peloton's IP counsel regarding the McClure patent," namely the patent that is the subject of VR Optics's patent-infringement claims against Peloton ("the '513 patent"). (Dkt. No. 130 at 1.) VRO/VDG argue that Peloton waived privilege with respect to these documents by disclosing its counsel's opinions regarding the '513 patent to numerous third parties, including to Third-Party Defendants Villency and Coffey. (Dkt. No. 130 at 1–3.)

### A. Legal Standard

"The attorney-client privilege exists for the purpose of encouraging full and truthful communication between an attorney and her client and 'recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.'" *Hollis v. O'Driscoll*, No. 13 Civ. 1955, 2013 WL 2896860, at *2 (S.D.N.Y. June 11, 2013) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)). Because "this case arise[s] under the federal law of the United States, although there are some

state claims based on either diversity or supplemental jurisdiction," the "federal law of privilege applies." *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, No. 06 Civ. 7785, 2007 WL 1573913, at *2 n.1 (S.D.N.Y. May 24, 2007).

"A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at *2 (quoting *In re Cty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007)). The party asserting the privilege "bears the burden of establishing all elements of the attorney-client privilege." *Id.* "The party claiming privilege also carries the burden of showing that it has not been waived." *Hollis*, 2013 WL 2896860, at *1; *see also In re Horowitz*, 482 F.2d 72, 81–82 (2d Cir. 1973) ("[I]t is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence. And, as with all privileges, the person claiming the attorney-client privilege has the burden of establishing all essential elements."); *United States v. Mount Sinai Hosp.*, 185 F. Supp. 3d 383, 391 (S.D.N.Y. 2016) ("The burden is on the party resisting discovery to establish the facts necessary to show that the privilege applies and that it has not been waived.").[2]

---

[2] Peloton asserts that the burden of proving waiver here is on VRO/VDG. (Dkt. No. 141 at 2.) In support of this contention, Peloton cites a footnote from a case in this District that explained that "in the context of the attorney-client privilege, the party bearing the burden of establishing waiver . . . has not been conclusively decided," and concluded largely on the basis of legal treatises that the "weight of authority suggests that the burden of showing a waiver rests with the opponent of the privilege." *JA Apparel Corp. v. Abboud*, No. 07 Civ. 7787, 2008 WL 111006, at *2 n.1 (S.D.N.Y. Jan. 10, 2008). This Court disagrees with the *Abboud* court's assessment of the weight of authority in this District and Circuit, and concludes instead on the basis of the cases cited above that "[t]he burden is on the party resisting discovery to establish the facts necessary to show that the privilege applies and that it has not been waived." *Mount Sinai Hosp.*, 185 F. Supp. 3d at 391. After all, the Second Circuit has expressly held that whether an attorney-client communication "was in fact kept confidential" is one of the elements that a party must demonstrate to establish the existence of attorney-client privilege, *In re Cty. of Erie*, 473 F.3d at 419, and that "the person claiming the attorney-client privilege has the burden of establishing all [of its] essential elements," *In re Horowitz*, 482 F.2d at 82.

B.  **Discussion**

The parties agree that the documents VRO/VDG seek to discover are communications between client and counsel that were made for the purpose of obtaining legal advice. The parties dispute, however, whether and to what extent Peloton has waived privilege with respect to these documents, and whether the common-interest doctrine obviates the effects of Peloton's disclosure of the contents of these privileged materials to Villency and Coffey.

1.  **Waiver**

"It is long-established in the Second Circuit that subsequent disclosure of materials by a client to a third party waives any privilege that may once have been attributable to the materials." *Hollis*, 2013 WL 2896860, at *2. Accordingly, "any such [attorney-client privilege] protection does not continue when the client voluntarily discloses the documents to a third party." *Id.* (alteration in original) (quoting *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003)).

Here, John Foley, Peloton's CEO, testified at his deposition to having extensively and repeatedly shared with others the opinions of Peloton's counsel regarding the '513 patent, its validity, and the strength of relevant prior art.[3] For example, Foley testified that during a 2012 trip to Taiwan, he told Villency "all kind of thoughts that [Peloton's] counsel had told [him]" about the '513 patent, including "thoughts about the ['513] patent that . . . are privileged." (Dkt. No. 130-3 at 215; *see also id.* at 213, 219 ("I would have told him what I've heard from my attorney, of course.").) Foley also described regularly meeting Villency and Coffey for drinks in

---

[3] "[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *United States v. Ghavami*, 882 F. Supp. 2d 532, 539 (S.D.N.Y. 2012) (alteration in original) (quoting *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348–49 (1985)). Here, neither party disputes that Peloton's CEO had the power to waive Peloton's attorney-client privilege.

4

the months and years following that 2012 trip to Taiwan, and he explained that during these outings he would talk "about every step of Peloton," steps that included "counsel's opinion" regarding the '513 patent and the strength of the prior art. (Dkt. No. 130-3 at 222; *see also id.* at 224 (describing these conversations as possibly numbering more than twenty).)

Peloton urges that these conversations did not result in the disclosure of the legal advice of Peloton's counsel, but only of the facts underlying that legal advice. (Dkt. No. 141 at 2–4.) But Foley made clear during his deposition that he disclosed "all kind of thoughts that [Peloton's] counsel had told [him]" about the '513 patent, including "thoughts about the ['513] patent that . . . are privileged." (Dkt. No. 130-3 at 215.) Peloton's argument that Foley disclosed only the facts underlying counsel's opinion, but stopped short of sharing those opinions themselves, are belied by Foley repeated confirmations that he "shared everything with [Coffey] and [Villency] about every step of Peloton." (Dkt. No. 130-3 at 222; *see also id.* at 218–19 ("I shared everything . . . . So if I knew something, chances are [Villency] knew it too.").) Moreover, Foley also testified that any opinions he had regarding the '513 patent's prior art could not have been based on the mere facts of the prior art's existence, but instead would have been formed entirely on the basis of counsel's communications regarding the prior art. (Dkt. No. 130-3 at 132–33, 136.) Simply put, the record does not support Peloton's characterization of the disclosures at issue as being limited to the facts underlying Peloton's counsel's opinion. To the contrary, the plain and repeated admissions by Foley that he told Third-Party Defendants Villency and Coffey "everything," including his counsel's privileged opinions on the '513

5

patent, is sufficient to demonstrate a waiver of the attorney-client privilege with respect to any communications between Peloton and its counsel regarding those opinions.[4]

### 2. Common-Interest Doctrine

Peloton argues that regardless of whether the conversations between Foley and VDG executives Villency and Coffey highlighted above would otherwise be sufficient to constitute waiver, the common-interest doctrine preserves Peloton's privilege over the contents of any attorney-client communications disclosed therein, because Peloton and VDG shared a common interest at the times of the relevant disclosures. (Dkt. No. 141 at 6–8.) VRO/VDG disagree. (Dkt. No. 149 at 4–6.)

"While the [attorney-client] privilege is generally waived by voluntary disclosure of the [privileged] communication to another party, the privilege is not waived by disclosure of communications to a party that is engaged in a 'common legal enterprise' with the holder of the privilege." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015). To be eligible for this exception, the disclosure must be made in circumstances "where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel . . . in the course of an ongoing common enterprise . . . [and] multiple clients share a common interest about a legal matter." *Id.* (alterations in original) (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)). Importantly, parties may share a common legal interest in the absence of an ongoing litigation. *Id.* But the interest shared by the privilege-holder and the third party

---

[4] Because the Court concludes that the conversations with Villency and Coffey are sufficient to demonstrate waiver of privilege with respect to communications from Peloton's counsel regarding the '513 patent—and because such waiver is not cured by the common-interest doctrine, *see infra* Section I.B.2—the Court does not reach VRO/VDG's contentions that emails sent by Foley to other third parties or the presence of a van driver within earshot of the 2012 conversation in Taiwan also amount to waiver. (*See* Dkt. No. 130 at 3–4; *see also* Dkt. No. 130-4.)

cannot be purely financial; instead, it must be "of a sufficient *legal* character to prevent a waiver by the sharing of [the privileged] communications." *Id.* at 41 (emphasis added).

In *Schaeffler*, an auto-parts manufacturer and a consortium of banks became entwined in a complex contractual relationship that ultimately required the parties' "cooperat[ion] in securing a particular tax treatment of a refinancing and restructuring" of various obligations under their contracts. *Id.* In the course of arranging this refinancing, the auto-parts manufacturer disclosed certain privileged attorney-client communications to the consortium of banks. *See id.* at 38. The district court held that this disclosure resulted in the auto-parts manufacturer's waiver of privilege, concluding that the manufacturer and the banks shared only common economic interests, but not common legal interests. *Id.* The Second Circuit disagreed. Recognizing that the manufacturers and the banks jointly foresaw that their proposed tax treatment of the refinancing "would likely involve a legal encounter with the IRS," the Second Circuit held that both sets of entities held "a strong common interest in the outcome of that *legal* encounter." *Id.* at 41 (emphasis added); *see also id.* at 44 (concluding that "subsequent litigation . . . was on this record highly likely"). The Second Circuit recognized that "the nature and viability of the refinancing and restructuring had [both] a commercial component and tax law component," *id.* at 41, but explained that the "financial interest of a party, no matter how large, does not preclude a court from finding a legal interest shared with another party where the legal aspects materially affect the financial interests," *id.* at 42.

Similarly, the court in *Johnson Electric North America, Inc. v. Mabuchi North America Corp.*, No. 88 Civ. 7377, 1996 WL 191590 (S.D.N.Y. Apr. 19, 1996), held that the disclosure of privileged attorney-client communications regarding a patent's validity did not constitute waiver where the communication was made outside of the context of an active litigation against the

7

party to which the disclosure was made, but was made "in order to facilitate the rendition of legal services to each of the clients involved in the conference." *Id.* at *3 (citation omitted). The *Johnson Electric* court emphasized that both parties were at the time of the disclosure jointly confronting the same specific legal threat: The disclosing party "was facing a claim for infringement of [the relevant] patents" from the patents' owner, and the party to whom the disclosure was made was facing the threat of "being drawn into the litigation both as a presumptively unwilling witness and as a potential target" of patent infringement claims. *Id.* The court thus concluded that the two entities, "as a matter of both litigation strategy and business necessity, . . . were *de facto* allies," despite the fact that no litigation had at that time commenced against one of the entities. *Id.* at *4.

Peloton emphasizes that the nature of the contractual relationship between Peloton and VDG made them *de facto* allies with respect to the common legal threat posed by the '513 patent. (*See* Dkt. No. 141 at 8.) Indeed, VDG warranted that the bike it was designing for Peloton "does not and will not infringe upon the rights of any third party" (Dkt. No. 48-1 ¶ 2.7(c)), and further agreed to indemnify Peloton for "any violation or alleged violation of any intellectual property rights" regarding the bike design (Dkt. No. 48-2 ¶ 7.1(b)). Thus, both Peloton and VDG had every reason to be concerned about the *legal* risk—albeit only a hypothetical legal risk—posed by potential infringement of the '513 patent (and whatever entity owned it or had the right to assert it). It is difficult to imagine any plausible reason for these parties to be discussing the '513 patent *other than* the legal risk of infringement. This supports Peloton's argument that its "common interest with [VDG] was of a sufficient legal character" to warrant the extension of privilege between otherwise unrelated entities. *Schaeffler*, 806 F.3d at 41.

But that does not end the analysis. In addition to a common legal interest, application of the common interest doctrine requires that "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* at 40 (quoting *Schwimmer*, 892 F.2d at 243). In other words, "they must have demonstrated cooperation in formulating a common legal strategy." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995). Although this presents a close question, the Court concludes that Peloton has failed to make that showing. The context of Peloton's disclosures of privileged information shows that these oral disclosures were part of broader conversations at bars and on business trips in which Foley was "shar[ing] everything about all of [his] hopes and dreams and every feeling and every detail of the entrepreneurial journey." (Dkt. No. 130-3 at 218.) The broad, abstract, and personal nature of these conversations suggests that the disclosures were not "made in order to facilitate the rendition of legal services." *Johnson Electric*, 1996 WL 191590, at *3. Hopes, dreams, and the entrepreneurial journey may be matters of great import, but they fall short of establishing "cooperation in formulating a common legal strategy" or "a joint defense effort or strategy has been decided upon and undertaken" with respect to a common legal issue.

Accordingly, the Court concludes that Peloton waived its privilege with respect to the content of its counsel's communications regarding the '513 patent when its CEO disclosed the contents of those communications to Villency and Coffey.

### 3. Scope of Waiver

Where, as here, "the privilege-holder . . . has made extrajudicial disclosures," *i.e.*, disclosures of privileged materials outside of the context of an active litigation, "and those disclosures have not subsequently been placed at issue during litigation," the extent of the waiver of privilege extends only to those "particular matters *actually disclosed*." *In re von Bulow*, 828

F.2d 94, 102 (2d Cir. 1987). Accordingly, VRO/VDG are entitled to discover only those attorney-client communications that Foley "*actually disclosed*" to third-parties. *Id.* The parties disagree with respect to the scope of Peloton's waiver of the attorney-client privilege. (Dkt. No. 141 at 9–10; Dkt. No. 149 at 7–8.)

Here, it is clear from the deposition transcripts submitted by the parties that during the 2012 van ride with Villency, Foley shared without any limitations "all kinds of thoughts about the ['513] patent that . . . are privileged" (Dkt. No. 130-3 at 215), including that Peloton "did not infringe and that [Peloton] had prior art that rendered it totally invalid"[5] (Dkt. No. 132-1 at 217). Foley confirmed that he "shared everything . . . every detail" and "if [he] knew something, chances are [Villency] knew it too." (Dkt. No. 130-3 at 218–19.) He further testified that he "would have told [Villency] what [he had] heard from [Peloton's] attorney." (Dkt. No. 130-3 at 219.) Based on this testimony, the Court concludes that as of the 2012 trip to Taiwan, Peloton cannot meet its burden of showing that its CEO had not "*actually disclosed*" the contents of any then-existing communications from Peloton's counsel regarding the '513 patent, and the privilege attached to those communications is therefore waived. *In re von Bulow*, 828 F.2d at 102.

Beyond that date, determining which specific attorney-client communications were disclosed by Foley and when the disclosures occurred, becomes more difficult. In the years following the 2012 trip to Taiwan, Foley described regularly meeting with Villency and Coffey for drinks at which he would share "every step of Peloton['s]" development and during which "[t]here were no details about [which he] held back," including "counsel's opinion" about the

---

[5] Again, Foley also testified that any opinions he had regarding the strength of the '513 patent's prior art would have been based entirely on the contents of counsel's communications regarding that prior art. (Dkt. No. 130-3 at 132–33, 136.)

'513 patent. (Dkt. No. 130-3 at 222–23.) But while Foley described these conversations with Villency and Coffey as occurring "at least once a week" and "[f]or years" (Dkt. No. 130-3 at 219), he also testified that these meetings "happened so frequently that it would be hard [for him] to put [his] finger on the exact conversations" during which these disclosures occurred (Dkt. No. 130-3 at 220). And VRO/VDG, for their part, "do not contend that they are entitled to discovery of any attorney-client communications or opinions regarding the ['513] patent that post-date the last social get-together among Mr. Foley, Villency, and Coffey, which occurred prior to the filing of the lawsuit." (Dkt. No. 149 at 7 n.4.) VRO/VDG, however, provide no evidence with respect to when that last social get-together was held.

The Court is mindful that "[t]he party claiming privilege," here, Peloton, "carries the burden of showing that it has not been waived." *Hollis*, 2013 WL 2896860, at *1; *see also Mount Sinai Hosp.*, 185 F. Supp. 3d at 391 ("The burden is on the party resisting discovery to establish the facts necessary to show that the privilege applies and that it has not been waived."). Yet the Court is also mindful that at this stage, it can "correctly f[i]nd a waiver by [Peloton only] as to the particular matters *actually disclosed*" to third parties. *In re von Bulow*, 828 F.2d at 102. Still, in the absence of any evidence from Peloton demonstrating that any of its counsel's opinions regarding the '513 patent were not among those actually disclosed to Villency and Coffey prior to the initiation of the instant litigation, Peloton has not met its burden of showing that any such "communications between client and attorney were made in confidence and have been maintained in confidence" such that the attorney-client privilege continues to apply. *In re Horowitz*, 482 F.2d at 81–82. Peloton is therefore ordered to produce any opinions of counsel regarding the '513 patent that were communicated prior to the date of the last pre-litigation meeting between Foley and Villency and Coffey.

## II. Peloton's Motion to Compel Production of Documents Withheld by VRO/VDG (Dkt. No. 137)

Peloton moves to compel the production of four categories of documents that have been withheld by VRO/VDG. (Dkt. No. 137 at 1–2.) The Court addresses each in turn.

### A. Documents evidencing VRO/VDG's revenues, expenses, profits, and losses, including cash statements, balance sheets, and income statements

Peloton moves to compel VRO/VDG to produce any documents evidencing VRO/VDG's revenues, expenses, profits, and losses, including cash statements, balance sheets, and income statements. (Dkt. No. 137 at 2–3.)

Peloton argues that these documents will be relevant to, among other things, its allegations that Villency and Coffey formed VR Optics with the purpose of evading and frustrating VDG's fulfillment of its contractual obligations to Peloton. (Dkt. No. 137 at 2–3.) The Court agrees with Peloton that the timing and extent to which VDG transferred any of its assets or obligations to VR Optics bears on Peloton's claims that VR Optics was created by Villency and Coffey for the purpose of allowing them to avoid VDG's contractual obligations to Peloton. Accordingly, the Court concludes that production of these documents is warranted under the standards set forth in Federal Rule of Civil Procedure 26(b)(1).

### B. All agreements or communications between VRO/VDG and/or any third party regarding any loan or contribution for the purpose of acquiring or transferring the '513 Patent

Peloton moves to compel VRO/VDG to produce any agreements or communications between VRO/VDG and/or any third party regarding any loan or contribution for the purpose of acquiring or transferring the '513 patent. (Dkt. No. 137 at 3.)

The Court agrees with Peloton that any evidence that VDG borrowed and then transferred to VR Optics money for purposes of allowing the latter organization to purchase the '513 patent—a purchase that in turn was made for purposes of asserting a patent infringement claim

against Peloton—is potentially relevant to Peloton's claims that VDG, Coffey, and Villency breached their covenant of good faith and fair dealing with Peloton, among other things. Accordingly, the Court concludes that production of these documents is warranted under the standards set forth in Rule 26(b)(1).

      **C.    Agreements or communications between VRO/VDG and Daniel R. McClure (the '513 Patent inventor) regarding the '513 Patent.**

Peloton moves to compel VRO/VDG to produce any agreements or communications between VRO/VDG and Daniel R. McClure (the inventor of the '513 patent) regarding the '513 patent. (Dkt. No. 137 at 3–4.)

VRO/VDG assert that any communications between VRO/VDG and McClure are privileged attorney-client communications, because VRO/VDG retained McClure as counsel. (Dkt. No. 139 at 3.) The Court has reviewed the portions of McClure's deposition transcript and the exhibits referenced therein submitted by the parties, and finds that VRO/VDG has met its burden of showing that it enjoyed an attorney-client relationship with McClure. (*See, e.g.*, Dkt. No. 139-2 at 83–84; *see also* Dkt. No. 139-3.) Accordingly, the documents Peloton now requests are privileged and the request to compel production of such documents is thus denied.

However, as Peloton notes and as VR Optics does not dispute, VR Optics has failed to produce a privilege log documenting any withheld communications from McClure. (Dkt. No. 137 at 4; Dkt. No. 139 at 3.) VR Optics is directed to produce a privilege log that includes any responsive documents that VR Optics is presently withholding on the basis of attorney-client privilege.

      **D.    Engagement letters or other agreements between VRO/VDG and their counsel, sufficient to show the fee arrangements between the parties.**

Peloton moves to compel VRO/VDG to produce all engagement letters and fee agreements between VRO/VDG and its counsel. (Dkt. No. 137 at 4–5.)

"The attorney-client privilege typically does not extend . . . to the identity of the client(s) or the fee arrangements that the client(s) may have entered into with the attorney." *Guas v. Conair Corp.*, No. 94 Civ. 5693, 2000 WL 358387, at *3 (S.D.N.Y. Apr. 7, 2000). But while "the fact of a retainer, the identity of the client, and the fee information are not privileged, the party seeking disclosure [still] must make a showing of the requested information's relevance to its claims or defenses." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, No. 09 Civ. 3701, 2013 WL 1896934, at *2 (S.D.N.Y. May 7, 2013) (internal citation omitted).

The Court agrees with Peloton that the timing of VDG's retention of its intellectual-property counsel bears on Peloton's claims against VDG, Villency, and Coffey, because those claims turn in part on whether and when VDG first sought to obtain the rights to the '513 patent for purposes of asserting it against Peloton. Similarly, the timing of VR Optics's retention of its intellectual-property counsel bears on Peloton's tortious-interference-with-contract claims against VR Optics. Accordingly, the Court concludes that production of the requested documents for these purposes is warranted under the standards set forth in Rule 26(b)(1).

Peloton also asserts that VRO/VDG's engagement letters with counsel are discoverable because VRO/VDG seek to recover reasonable attorney's fees in this action. (Dkt. No. 137 at 5.) But as VRO/VDG note, Peloton cites no precedent for its contention that a party's request for attorney's fees and costs warrants compelling the production of that party's fee arrangements with counsel before trial. (*See* Dkt. No. 139 at 5.) There is no reason why discovery of the portions of the requested documents disclosing fee arrangements cannot wait for post-judgment briefing of any eventual motion for attorney's fees and costs. Accordingly, the Court agrees with

VRO/VDG that their engagement letters or other agreements with counsel are not discoverable on this basis at this time.

### III. VRO/VDG's Motion to Compel Production of Documents from Non-Party L Catterton (Dkt. No. 143)

VRO/VDG move to compel the production of documents from non-party L Catterton ("Catterton"). (Dkt. No. 143.) According to VRO/VDG, these documents contain information that VRO/VDG intend to use for impeachment purposes. (Dkt. No. 143 at 1.) Peloton and Catterton present two objections to VRO/VDG's motion to compel production of these documents: (1) that VRO/VDG's requests for these documents were untimely (Dkt. No. 146 at 1–2; Dkt No. 147 at 1–3); and (2) that the documents are not relevant (Dkt. No. 146 at 2; Dkt. No. 147 at 3–4). The Court finds no merit in either contention.[6]

With respect to the relevance of these documents, VRO/VDG correctly assert that these documents may contain information that could be used for impeachment purposes at trial. (Dkt. No. 143 at 4.) Peloton counters that extrinsic evidence of a collateral matter is generally inadmissible under Federal Rule of Evidence 608(b). (Dkt. No. 147 at 3.) "Information within [the] scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Here, the evidence sought by VRO/VDG may potentially be inquired into on cross-examination, *see* Fed. R. Evid. 608(b), regardless of the admissibility of the specific documentary evidence presently sought by VRO/VDG. Peloton's arguments with respect to the supposed triviality of the information sought by VRO/VDG go to the weight of this evidence, not

---

[6] Catterton also argues that the requested documents are subject to a confidentiality agreement between it and Peloton. (Dkt. No. 146 at 3.) However, VRO/VDG's subpoena provided that Catterton's productions could be made subject to the protective order governing discovery in this action. (*See* Dkt. No. 143-4 at 10; *see also* Dkt. No. 82.) The Court affirms that any documents produced by Catterton in compliance with VRO/VDG's subpoena may be made subject to the protective order at Docket Number 82.

to its relevance. Accordingly, the Court concludes that production of these documents is warranted under the standards set forth in Rule 26(b)(1).

With respect to the timeliness of VRO/VDG's requests for these documents, VRO/VDG served a subpoena on Catterton requesting these documents on January 31, 2019 (Dkt. No. 143-4), the day before this case's fact discovery deadline (Dkt. No. 121). At least one court in this District has deemed a subpoena served on a non-party shortly before a deadline to complete fact discovery to be timely for purposes of Federal Rule of Civil Procedure 45. *See Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 15 Civ. 4428, 2017 WL 10221320, at *4 (S.D.N.Y. Feb. 27, 2017). Although another court in this District has deemed a subpoena served on a third party to be untimely when served on the final day of fact discovery, *see Kelly v. Wright Med. Tech., Inc.*, No. 00 Civ. 8808, 2003 WL 40473 (S.D.N.Y. Jan. 3, 2003), that court based its decision on the fact that the serving party knew of the availability of the documents at issue long before but "offered no explanation for [its] failure to seek this material earlier," *id.* at *1. In contrast, here VRO/VDG represents that it did not learn of the documents at issue until seven days prior to the close of fact discovery.[7] (Dkt. No. 143 at 4.) Given this Court's "broad discretion to direct and manage the pre-trial discovery process," *see Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004), and given the particular circumstances attendant to the

---

[7] VRO/VDG explains that it was only during a deposition of a Peloton executive, conducted one week before the close of fact discovery, that VRO/VDG was able to confirm the existence of these documents. (Dkt. No. 143 at 4.) This deposition occurred about two weeks *after* the deposition of another Peloton executive who was unable to confirm the existence of these documents despite repeated requests from VRO/VDG to do so. (Dkt. No. 143 at 2–3.) The Court also notes that VRO/VDG's deposition of the executive who confirmed the existence of these documents had previously been scheduled for an even earlier date, but was adjourned upon Peloton's request. (*See* Dkt. Nos. 118–21.)

timing of the subpoena on Catterton, the Court declines to foreclose VRO/VDG's discovery of these otherwise relevant documents on grounds of untimeliness.

Accordingly, Catterton is directed to produce the documents requested in the January 31, 2019 subpoena at Docket Number 143-4.

## IV. Motions to Seal

The parties have moved for leave to file portions of their briefing of the instant motions to compel under seal. (*See* Dkt. Nos. 138, 140, 142, 144, 150; *see also* Dkt. Nos. 131, 133, 135 (motions for leave to file under seal provisionally granted by the Court in connection with the instant motions to compel).)

In support of their motions to seal, the parties cite only this case's protective order governing the treatment of documents produced in discovery in this action. (*See* Dkt. No. 82.) The parties have failed to adequately justify their sealing requests under the standard set out in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).

The Court concludes that the parties' briefs and the attached exhibits filed in connection with these motions to compel are "judicial documents" to which a presumptive right of public access attaches, because the filings are "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119 (second quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995); *see also Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608, 2014 WL 4346174, at *2 (S.D.N.Y. Sept. 2, 2014) (holding that documents submitted "in support of a motion to compel discovery . . . [and that are] necessary to or helpful in resolving that motion" qualify as "judicial documents"); *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483, 2006 WL 3016311, at *2 (S.D.N.Y. Oct. 23, 2006) (same).

Importantly, given "the presumption of access under both the common law and the First Amendment, the documents may be kept under seal if 'countervailing factors' in the common

17

law framework or 'higher values' in the First Amendment framework so demand." *Id.* at 124. Neither party has attempted to satisfy the standards set forth under either of these frameworks. *Cf. id.* at 126 ("[T]he mere existence of a confidentiality order says nothing about whether complete reliance on the order to avoid disclosure [is] reasonable.").

Accordingly, on or before June 5, 2019, the parties are directed to file on the public docket unredacted versions of all documents previously filed under seal in connection with the motions to compel at Docket Numbers 130, 137, and 143. Alternatively, on or before June 5, 2019, the parties may move for leave to file under seal revised redacted versions of these documents, provided that any proposed redactions are limited to those portions of the documents that independently satisfy the standards set forth in *Lugosch*.

## V. Conclusion

For the foregoing reasons, VRO/VDG's motion at Docket Number 130 to compel Peloton to produce documents reflecting Peloton's communications with its intellectual-property counsel regarding the '513 patent is GRANTED.

Peloton's motion at Docket Number 137 to compel the production of various categories of documents that have been withheld by VRO/VDG is GRANTED in part and DENIED in part as set forth above.

VRO/VDG's motion at Docket Number 143 to compel the production of documents by non-party L Catterton is GRANTED.

The parties' motions for leave to file under seal are DENIED without prejudice.

The Clerk of Court is directed to close the motions at Docket Numbers 130, 137, 138, 140, 142, 143, 144, 148, and 150.

SO ORDERED.

Dated: May 15, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge