# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

VR OPTICS, LLC,

      Plaintiff,

v.

PELOTON INTERACTIVE, INC., a Delaware
Corporation,

      Defendant.

Civil No. 1:16-cv-6392 (JPO)

PELOTON INTERACTIVE, INC.,

      Third-Party Plaintiff,

v.

VILLENCY DESIGN GROUP, LLC, ERIC
VILLENCY, AND JOSEPH COFFEY,

      Third-Party Defendants.

## PLAINTIFF AND THIRD-PARTY DEFENDANTS'
## RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

      Pursuant to Local Civil Rule 56.1, Plaintiff VR Optics, LLC and Third-Party Defendants

Villency Design Group, LLC, Eric Villency, and Joe Coffey submit the following Statement of

Undisputed Material Facts:

### Villency Design Group LLC

      1.    Villency Design Group LLC ("VDG") is a Delaware Limited Liability Company

formed on September 20, 2011.  (Declaration of Paul S. Doherty III, Esq. dated July 1, 2019

(hereafter, the "Doherty Decl."), Exhibit 1.)

2. Joseph Coffey ("Coffey") and Eric Villency ("Villency") are the owners and sole members of VDG. (Doherty Decl. Exhibit 2 (Coffey Dep.), at 28:18-19, 39:5-25; Doherty Decl. Exhibit 3 (Villency Dep.), at 20:14-21:25.)

3. Villency received a B.A. in English from the University of Wisconsin in 1997; he does not have any other degrees or certificates. (Doherty Decl. Exhibit 3 (Villency Dep.), at 30:17-31:6.)

4. In 2002, Villency became the CEO of Maurice Villency, a custom furniture design firm founded by Villency's grandfather Maurice in 1932. (Sarah Lawson, "How to Innovate Within a Legacy Brand," Dec. 4, 2015, *Fast Company* (available at https://www.fastcompany.com/3054044/how-to-innovate-within-a-legacy-brand) (last visited June 26, 2019. (*See* Doherty Decl. Exhibit 4.) Subsequently, in 2011, Villency and Coffey formed Villency Design Group. (*See* ¶ 1, *supra*.)

5. Villency is Chief Executive Officer and a managing member of VDG. (Doherty Decl. Exhibit 3 (Villency Dep.), at 20:7-8.)

6. Coffey received a B.A. in Economics from Lafayette College in 1987, and a J.D. from St. John's University in 1992. (Doherty Decl. Exhibit 2 (Coffey Dep.), at 15:22-17:12.)

7. Coffey's early career included positions in international legal consulting (*id.* at 18:14-19:12) and criminal defense (*id.* at 19:16-20:17). Coffey subsequently took a non-attorney position with a venture capital company (*id.* at 20:20-23:9), and then became managing member of an LLC that owned a poker room in Florida, a position he held until joining VDG (*id.* at 23:20-27:2).

8. Coffey is the other managing member of VDG, and his responsibilities have included management of legal, business, and general strategy issues. (*Id.* at 39:7-12; 72:16-19.)

9.      VDG's first project, and the primary basis for its formation, was the design and manufacture of a stationary bicycle for an indoor cycling company called SoulCycle.  (*Id.* at 31:5-23; ███████████████████████████████████████████████

10.     In addition to its work with SoulCycle, VDG designed products and equipment for other companies in the fitness industry, including: ███████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████, and workout benches (Doherty Decl. Exhibit 2 (Coffey Dep.), at 78:15.)

11.     ███████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ ██   ████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████ ██   ████████████████████████████████████████ ███████████████████████████████████████████████ ██  ██████████████████████████ ██   ████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████

**VR Optics LLC**

15.     VR Optics LLC ("VRO") is a New York Limited Liability Company that was formed on June 20, 2016.  (Doherty Decl. Exhibit 6, at 1.)

16.     Coffey and Villency are the owners and sole members of VRO.  (Doherty Decl. Exhibit 3 (Villency Dep.), at 22:11-17; Doherty Decl. Exhibit 2 (Coffey Dep.), at 90:19-91:11.)

17.     ████████████████████████████████████████████████

████████████████████████████████████████

██    ████████████████████████████████████████████

████████████████████████████████████████████████████

██████     *see also* Doherty Decl. Exhibit 2 (Coffey Dep.), at 167:10-23.)

**Peloton Interactive, Inc.**

19.     Peloton Interactive Inc. ("Peloton" or "Peloton Interactive") was formed in February 2012 as Peloton Interactive LLC.  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 13:5; 25:20-25; Doherty Decl. Exhibit 10 (Foley Dep.), at 48:10-16.)

20.     Peloton's principal place of business is 125 West 25th Street, 11th Floor, New York, New York, 10001.  (Doherty Decl. Exhibit 11, at ¶ 8.)

21.     According to Peloton's founders, "Peloton" refers to "a group of riders that ride together to conserve energy.  It's the lead pack of a cycling race."  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 26:23-25.)

22.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

23.     The three "core" Peloton products are the interactive stationary bicycle ("Peloton Bike"), an interactive treadmill (the "Peloton Tread"), and a subscription service (the "Peloton Digital Platform").  (*Id.* at 11:1-12:4.)

24.     Peloton's founders are John Foley ("Foley"), Thomas Cortese ("Cortese"), Graham Stanton ("Stanton"), Hisao Kushi ("Kushi"), and Yony Feng ("Feng").  (*Id.* at 13:14-15.)

25.     Foley says he came up with the concept behind Peloton in or around mid-2011. (Doherty Decl. Exhibit 10 (Foley Dep.), at 49:25-50:19.)

26.     The interactive technology that Foley claims he conceptualized utilizes hardware, software, time-shifting and streaming content, and personal metrics.  (*Id.* at 59:8-25; 60:5-18.) This interactive technology included "an attractive user interface and related software and backend systems to integrate the bike and tablet and track, synchronize, and dynamically display metrics." (Doherty Decl. Exhibit 11, at ¶ 28.)  The interactive technology further required integration of Peloton's "own software so that the software could communicate with the bike to track performance metrics, store those metrics, communicate those metrics back to the rider, and transfer those metrics to a server so that they could be synchronized and compared with other riders' metrics."  (*Id.* at ¶ 30.)

27.     Foley received a B.S. degree in industrial engineering from the Georgia Institute of Technology in 1994, and an MBA from Harvard Business School in 2001.  (Doherty Decl. Exhibit 10 (Foley Dep.), at 9:4-22.)

28.     Foley's professional experience includes executive positions with various e-commerce and technology companies, including Citysearch, Ticketmaster, Evite and Pronto.com, all companies owned by IAC/InterActiveCorp. (*Id.* at 11:10-13:24; 140:10-141: 25.)

29.     Immediately prior to founding Peloton, Foley was the president of barnesandnoble.com.  (*Id.* at 14:2-6.)

30.     Foley is Peloton's Chief Executive Officer.  (Doherty Decl. Exhibit 11, at ¶ 23.)

31.     Cortese became the Chief Operating Officer of Peloton in 2013.  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 10:11-16.)

32.     Cortese does not have any formal training in technology, but he has "been in the tech sector for just over ten years." (*Id.* at 9:25-10:4.)

33.     Cortese had previously worked with Foley at Pronto.com, an IAC company. (Doherty Decl. Exhibit 10 (Foley Dep.), at 140:20-141:3.)

34.     Stanton joined Peloton as President in 2012 and transitioned to Senior Vice President for Performance Marketing in or around 2016; since mid-2018 he has held the title of Senior Vice President for Global Sales and Marketing for Peloton Digital. (Doherty Decl. Exhibit 12 (Stanton Dep.), at 19:6-21:5; 26:2-6.)

35.     Stanton received a degree in Applied Mathematics with a focus in Economics from Harvard University in 2006. (*Id.* at 9:19-25.)

36.     Stanton had worked with Foley "at Pronto within IAC as a software engineer." (Doherty Decl. Exhibit 10 (Foley Dep.), at 141:19-22.)

37.     Stanton's professional background also includes positions in computer application development and management of various web-based businesses. (Doherty Decl. Exhibit 12 (Stanton Dep.), at 10:15-13:21.)

38.     Stanton "did some software programming" in Peloton's "early days." (*Id.* at 245:16-17.)

39.     Feng joined Peloton in 2012 as a software engineer; in 2013 he became the Chief Technical Officer. (Doherty Decl. Exhibit 13 (Feng Dep.), at 35: 5-18.)

40.     Feng received both B.S. and M.S. degrees in Electrical and Computer Engineering from the Georgia Institute of Technology in 2006 and 2007, respectively. (*Id.* at 27:2-23.)

41.     Prior to joining Peloton, Feng worked as a software engineer for a variety of companies. (*Id.* at 31:2-34:5.)

42.     Feng was Peloton's "technological guru."  (Doherty Decl. Exhibit 11, at ¶ 27).)

43.     Kushi has been a legal advisor to Peloton since January 2012; he became General Counsel in or around May 2015.  (Doherty Decl. Exhibit 14 (Kushi Dep.), at 9:7-10:9.)

44.     Kushi graduated from the University of Massachusetts in Amherst, in 1988, and received a J.D. from Boston College Law School in 1992.  (*Id.* at 61:18-22.)

45.     Kushi had worked with Foley in connection with companies owned by IAC. (Doherty Decl. Exhibit 9 (Cortese Dep.), at 140:10-14.)

**Villency Design Group and Peloton**

46.     John Foley and Eric Villency were introduced via email in January 2012.  (Doherty Decl. Exhibit 3 (Villency Dep.), at 16:5-11; Doherty Decl. Exhibit 15.)

47.     Foley sought out the introduction because "he appreciated [VDG's] work for SoulCycle and Organic Avenue" (Doherty Decl. Exhibit 3 (Villency Dep.), at 16:9-11; *see also* Doherty Decl. Exhibit 10 (Foley Dep.), at 144:10-145:19 ("I believe I searched the internet and found the rendering of the SoulCycle bike and some article that referenced Vilency Design Group … I, through, probably, friends, was able to reach out to Eric Villency and get a meeting with him. … the SoulCycle bike was – has been celebrated from its – I want to say industrial design, but certainly its look.  I think the bright yellow does some things that made it feel different than what was … in the category.").)

48.     Foley believed that hiring VDG would provide Peloton with "second-mover advantage on SoulCycle … because those guys were also involved in building that bike.  So to the extent we wanted something better, you know, Eric [Villency] and Scott Milstein were helpful in allowing us to build a better bike than the SoulCycle bike."  (Doherty Decl. Exhibit 10 (Foley Dep.), at 74:19-75:4.)

49.     Foley also knew that VDG "had other relationships in the fitness world." (*Id.* at 322:5-8.)

50.     Following the introductory email, Villency and Foley met at the SoHo House, a hotel and members' club in Manhattan. (Doherty Decl. Exhibit 3 (Villency Dep.), at 16:24-17:9; Doherty Decl. Exhibit 10 (Foley Dep.), at 145:24-25.)

51.     During their first meeting, Foley told Villency that he had a team in place that was beginning to build the business that would become Peloton, and raised the possibility of Villency's being "engaged as the person that would help [Peloton] with industrial design and contract manufacturing and some of the stuff he had done with SoulCycle." (Doherty Decl. Exhibit 10 Foley Dep.), at 146:13-23.)

**The 2012 Agreement**

52.     Villency, Foley, Coffey and Kushi negotiated the details of an agreement between VDG and Peloton throughout March 2012. (*See, e.g.*, Doherty Decl. Exhibit 16.)

53.     On April 6, 2012, VDG and Peloton executed the Design, Development and Manufacturing Agreement (the "2012 Agreement"). (Doherty Decl. Exhibit 17.)

54.     Eric Villency signed the 2012 Agreement on behalf of VDG and John Foley signed on behalf of Peloton. (*Id.* at 13.)

55.     Both Villency and Foley signed the 2012 Agreement in their corporate, and not individual, capacities. (Doherty Decl. Exhibit 9 (Cortese Dep.), at 248:13-22; Doherty Decl. Exhibit 10 (Foley Dep.), at 268:7-16.)

**VDG's Performance under the 2012 Agreement – Factory Relationship**



; Doherty Decl. Exhibit 10 (Foley Dep.), at 162:5-163:7; Doherty Decl. Exhibit 19.)

58. ██████████████████████████████████████████

██████████████████████████; *see also* Doherty Decl. Exhibit 19, at 1 (describing the meeting with Tonic and noting that they were "moving very quickly toward a partnership with our preferred manufacturing partner").)

59. VDG, on behalf of Peloton, and Tonic negotiated the terms of the manufacturing relationship between September and November 2012. (*See, e.g.*, Doherty Decl. Exhibit 20.)

60. Peloton, primarily through Cortese, joined the negotiations in or around January 2013. (*See, e.g.*, Doherty Decl. Exhibit 21.)

61. On May 6, 2013, Peloton and Tonic entered into the "Peloton & Tonic ODM Product Development and Manufacturing Agreement" (the "Tonic Agreement"), pursuant to which Tonic would become the exclusive manufacturer of Peloton's "indoor exercise bike." (Doherty Decl. Exhibit 22, at §§ 1(a) and 3(a).)

62. The Tonic Agreement provides that Tonic owns and licenses to Peloton "everything they created prior to working with Peloton that is in use today in other Tonic Products," and that "Peloton owns the bike industrial design and the exclusive right to sell the product worldwide." (*Id.* at § 4(a)-(b).)

**Peloton and Innocomm**

63.     Peloton considered the manufacture of the bike and the manufacture of the tablet/computer console to be "two discrete pieces." (Doherty Decl. Exhibit 19, at 1 ("As you may know, we are dividing the manufacturing discussions into two discrete pieces: the Spin Bike and the Computer Console."); *see also* Doherty Decl. Exhibit 10 (Foley Dep.), at 173:18-174:7.)

64.     During their 2012 trip to Taiwan, Cortese and Foley visited Innocomm, the manufacturer that would ultimately design and fabricate the tablet/flat screen interactive device. (*See* Doherty Decl. Exhibit 19, at 1 (describing the meeting with "a partner who we are much more excited about"); Doherty Decl. Exhibit 10 (Foley Dep.), at 169:19-170:9 (confirming that the meeting was with Innocomm.)

65.     ████████████████████████████████████████████████████████████████
████████████████████████████████████ *see also* Doherty Decl. Exhibit 23 (email exchange where Milstein gives Cortese travel advice for his visit to Innocomm).)

██ ██ ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ )

67.     Cortese further said that both parties "have permission to share the necessary information about this project with one another to the extent that it is necessary to manage the integration of the bike electronics with the console." (*Id.*)

68.     No representatives from VDG were included in the introductory email. (*Id.*)

69.     Early discussions of the software and console involved representatives from Peloton, Innocomm, and Tonic, but <u>did not</u> include VDG:



- o No VDG representative was copied or otherwise included in this communication;



- o No one from VDG is included in this email communication.



- o VDG is not included – nor even mentioned – in this thread.



- o VDG was not a part of this conversation.

### **VDG's Performance under the 2012 Agreement – Design**

70.

71.     Eric Villency provided creative direction in the "form factor" of the bike frame and took visual inspiration from "outdoor bikes," including their "carbon fiber [and] sweeping lines." (Doherty Decl. Exhibit 3 (Villency Dep.), at 67:20-72:8.)

72.     All of the work that Villency performed in connection with the Peloton project was performed on behalf of VDG. (Doherty Decl. Exhibit 10 (Foley Dep.), at 269:21-270:3.)



75.     VDG provided "a host of services including industrial design, providing CAD drawings, consulting on ergonomics, usability, comfort, and things like seat." (Doherty Decl. Exhibit 9 (Cortese Dep.), at 313:6-10.)

76.     VDG also provided insight, advice and direction on non-technology elements of the bike, including:

- The transparent chain guard exposing the pedal gear. (*See* Doherty Decl. Exhibit 3 (Villency Dep.), at 69:12-20 (discussing the "clear chain guard with coloring the spoke … so that it popped through"); *see also* Doherty Decl. Exhibit 30 (an email from Foley to investors attaching the "latest bike renderings" and noting that, "Yes, that is a transparent chain guard exposing the pedal gear; since we are using a belt drive, our bike will be 'clean' (read: not like a chain-driven bike that needs grease.")).)

77.     Peloton repeatedly acknowledged that the overall aesthetic of VDG's design of the

bike frame was a factor in the Peloton Bike's success:



- A 2013 investor pitch said that the Peloton Bike "merges high design with modern technology – and there's nothing else like it." (Doherty Decl. Exhibit 33, at 31.)



- In a 2015 email, Foley forwarded to the Peloton Board of Directors and to Coffey a Bloomberg article referring to the Peloton Bike as "designed by Eric Villency, a kind of Jony Ive for stationary bikes, who also designed the silver or yellow bikes used in SoulCycle studios." (Doherty Decl. Exhibit 35.)

- Foley forwarded the same article to Villency, writing, "And there you have it, you're Jony Ive." (Doherty Decl. Exhibit 36.)

    o   *See also* Doherty Decl. Exhibit 10 (Foley Dep.), at 297:10-23 (describing Jony Ive as the "chief design officer of Apple … Steve Jobs' right-hand guy who helped them design a lot of the cool, sexy products you see today.").

- When asked about the importance of the bike's aesthetics, Foley testified:

        I think it's generally important.  Are we selling more Peloton
        Bikes because it's a beautiful design?  Impossible to say. …
        pulling any piece of the whole ecosystem, out it's very hard.
        I think Peloton would still be a fantastic business if it were a
        slightly less beautiful design.  But, you know, I don't want
        to find out.

    (Doherty Decl. Exhibit 10 (Foley Dep.), at 75:5-20.)

- Foley also shared with the Peloton team a Wall Street Journal article about the importance of aesthetics in exercise equipment. (Doherty Decl. 37.)

**Limits to the Scope of VDG's Work**



79.     VDG did not develop or produce the technological components of the Peloton Bike.

*See, e.g.*:

- Doherty Decl. Exhibit 10 (Foley Dep.), at 153:19 ("[VDG] only designed the physical parts of the bike. The bike system including the tablet.");



- *Id.* at 114:7-9 (Cortese testified, "Villency Design Group did not have input, to my knowledge, of the operation of the leaderboard servers.");

- Doherty Decl. Exhibit 12 (Stanton Dep.), at 245:20-21 ("I did not personally work with anyone at VDG on software programming"); 246:23-247:3 ("I did not personally observe" anyone from VDG working with Feng on code or engineering");

- Doherty Decl. Exhibit 13 (Feng Dep.), at 77:12-17 ("[VDG] did not write software on the console … that I am aware of. … But they designed the bike.");

81. ████████████████████████████████████████████████████

████████████████████████████████████████

**Peloton Satisfied with VDG's Performance Under the 2012 Agreement**

82.     Peloton was satisfied with VDG's performance in connection with the 2012 Agreement.  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 266:7-15; ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Doherty Decl. Exhibit 9 (Cortese Dep.), at 268:2-270:15 (affirming that the bike discussed in the previously referenced email was the bike produced under the 2012 Agreement and that, "[o]ne of the aspects of product development and design was the overall esthetic [sic], and we did feel that – and feel today that [VDG] and Peloton succeeded in creating a distinguished esthetic [sic]."); *see also* Doherty Decl. Exhibit 30 (Foley writes to VDG, "Keep pushing.  I love your work!").)

83.     Peloton did not serve a notice of default or otherwise terminate the 2012 Agreement pursuant to its terms; and Peloton paid VDG in full for its services under the 2012 Agreement. (Doherty Decl. Exhibit 10 (Foley Dep.), at 272:24-273:7; 316:15-18.)

84.     VDG performed its obligations under the 2012 Agreement in full.  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 252:20-253:8; 316:13-14.)

**The 2014 Agreement**

85. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ ; Doherty Decl. Exhibit 9 (Cortese Dep.), at 254:8-17.)

██ ██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

89.     On June 24, 2014, VDG and Peloton executed the Bike Development and Services Agreement (the "2014 Agreement"); the Agreement was signed on behalf of VDG by Eric Villency as "Managing Member," and on behalf of Peloton by John Foley as "CEO/Manager." (Doherty Decl. Exhibit 45, at 29.) Both men executed the 2014 Agreement in their corporate capacities. (Doherty Decl. Exhibit 9 (Cortese Dep.), at 248:23-249:24.)

90.     The term of the 2014 Agreement was limited to two years. (Doherty Decl. Exhibit 45, at 7.)

91.     In the 2014 Agreement, the parties added a provision under which VDG was to be responsible for handling a return/refurbish service. (*Id*. at 5-6.) The 2014 Agreement provided for termination of the return and refurbish services upon 90 days' written notice to VDG. (*Id.* at 7.)

92.     Peloton was satisfied with the return and refurbish services provided by VDG. (Doherty Decl. Exhibit 9 (Cortese Dep.), at 259:11-15; *see also* Doherty Decl. Exhibit 46 ("The more we work with Robbie the more we believe in VDG's ability to help us make happy customers.").)

93.     However, by email dated January 6, 2016, Peloton terminated the refurbishing portion of the 2014 Agreement, citing Peloton's growth and desire to "spread [its] own service operation around the country" and "take the repair/refurbish operation in house." (Doherty Decl. Exhibit 47.)

94.     Similarly, beginning in early 2015, while the 2014 Agreement was still in effect, Peloton began taking steps to reduce VDG's role and Peloton took over many of VDG's responsibilities under the 2014 Agreement. (*See, e.g.*:

- Doherty Decl. Exhibit 10 (Foley Dep.), at 274:15-275:9 (describing the circumstances leading to Peloton's decision to take over the relationship with Tonic: "[VDG] is a relatively small boutique company. As Peloton grew ... their organization wasn't scaling to keep up with the Peloton ambitions and volume of work. So as Tom [Cortese] was building his team ... for him to go through a shop that had very light resources and other clients, it was just a structural tension that was untenable.")



- *Id.* at 271:12-272:14 (Foley stated, "About halfway through [the term of the 2014 Agreement] we decided – because Tom [Cortese] wanted a direct relationship with Tonic and didn't want Villency Design Group managing our manufacturers anymore we made a decision to pay [VDG] for the contract for a year for effectively doing no work, which my cofounders were frustrated with ... it was continuing to honor the agreement even though we asked them to no longer do anything in the agreement."

- *Id.* at 273:9-20 (noting that the relationship between VDG and Peloton "started to get less good" around the time that Peloton decided to take over the relationship with Tonic).

95.     Peloton allowed the 2014 Agreement to expire because the company was "largely done with the relationship" (*id.* at 318:12-13), ███████████████████████████████████ ████████████████████████████████████████████

96.     By June 2016, Peloton had "already extracted" itself from the return and refurbish service, and it was "no longer using [VDG] to manage the contract relationship of the contract manufacturer because [Peloton] found that it was more efficient to go direct." (*Id.* at. 318:14-21; *see also id.* at 339:24-340:4 (by June 2016, Peloton "saw that the commercial relationship [with VDG] didn't make sense anymore").)

97.     Furthermore, Foley admitted that, by this time, "[t]here wasn't material industrial design work.… At this point we have industrial designers in-house, so we just built the business that, you know, is Peloton today. So I think the relationship with the Villency Design Group had run its course." (*Id.* at 319:8-16.)

98.     Peloton never served a notice of default to terminate the 2014 Agreement (*id.* at 273:4-7), nor in any way placed VDG on notice that it was failing to perform under the 2014 Agreement (Doherty Decl. Exhibit 9 (Cortese Dep.), at 261:5-10).

99.     Peloton paid VDG all monies due under the 2014 Agreement. (Doherty Decl. Exhibit 10 (Foley Dep.), at 272:2-14.)

**The '513 Patent**

100.    The "Interactive Fitness Equipment" that is the subject of the '513 Patent was invented by Daniel R. McClure ("McClure") and was patented on June 7, 2005. (Doherty Decl. Exhibit 49.)

101.    The '513 Patent covers an invention that "is generally directed to a computerized fitness equipment that is designed to simulate, emulate, or implement actual race conditions with other users" through the use of "sensors to monitor performance parameters," a visual display, and a "communication interface … to communicate the first performance parameters to at least one remote, similarly configured, fitness equipment."  The equipment also includes "logic to provide a visual display of a user's performance (as measured by the first performance parameters)" and "logic to compare" the performance parameters of one user with those of the other, remote user, and "display the results in a comparative fashion to the user."  (*Id.* at 1.)



104.    Cortese first learned of the '513 Patent in April 2012.  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 193:3-5.)

105.    In or about that time, Peloton inquired about purchasing the '513 Patent from McClure. (Doherty Decl. Exhibit 14 (Kushi Dep.), at 194:21 to 200:9.)

106.    Foley and the other Peloton co-founders chose not to purchase the '513 Patent. (*See, e.g.*:

- Doherty Decl. Exhibit 10 (Foley Dep.), at 195:5-10 ("We did not try to buy that patent.  We – counsel approached McClure to see where his head was. … and by

that time, somebody at Microsoft had already purchased it. So there was no discussion to buy it.")

- *Id.* at 222:15-19 (Foley describing the evolution of Peloton's views of the '513 Patent: "…okay, we've identified it, we got counsel's opinion, somebody bought it. Who could that somebody be? Oh, it's Microsoft. Oh, we found more prior art so we sleep even better.")

- Doherty Decl. Exhibit 9 (Cortese Dep.), at 217:15-17 ("I mean, it summarizes down to we don't infringe and we don't … think that the patent is valid.");

- *Id.* at 219:6-7 (Cortese states, "our opinion then, as it is now, [is] that we do not infringe and their patent is invalid.")

- *Id.* at 231:12-15 (Cortese: "To my knowledge we never took any formal steps to attempt to acquire the patent [from McClure]. … No informal attempts either.")

- *Id.* at 231:25-232:8 (Cortese stating that he did not believe Peloton ever explored purchasing or licensing the '513 Patent from Microsoft).)

- *Id.* at 323:4-324:11 (Cortese claiming that Peloton had asked "the best patent counsel on the planet" to determine whether the Peloton Bike infringed the '513 Patent, that counsel had concluded that there was no infringement and that the '513 Patent was otherwise invalid, and that Peloton relied on those conclusions).

████████ ██ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

108.    By email of the same date, Foley shared this "[g]enerally very good news" with "everyone@peloton.com." (*Id.*)

109.    Peloton never attempted to purchase the '513 Patent from Microsoft. (Doherty Decl. Exhibit 14 (Kushi Dep.), at 202:2-10.)

████████ ██ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████

111.    On or about July 31, 2013, Peloton filed an application for patent number 9,174,085 with the U.S. Patent and Trademark Office.  (Doherty Decl. Exhibit 9 (Cortese Dep.), at 236:19-237:22.)

112.    In connection with this application, Peloton filed an Information Disclosure Statement, wherein the company disclosed all prior art of which it was aware at the time the application was filed.  (*Id.* at 238:3-13; Doherty Decl. Exhibit 54.)

113.    Peloton included the '513 Patent on this Disclosure Statement.  (*Id.* at 8; Doherty Decl. Exhibit 9 (Cortese Dep.), at 238:19-239:2.)

114.    Peloton did not rely on VDG to tell Peloton whether the Peloton Bike infringed the '513 Patent.  (*Id.* at 325:5-326:5; *see also* Doherty Decl. Exhibit 10 (Foley Dep.), at 226:18-227:6 (Foley stating, "[VDG] didn't understand our systems well enough and I didn't understand our systems well enough nor the details of the McClure patent, so it was only based on my counsel's interpretation that the specifics of the claims were not infringed.  So I don't think we went too deep on the claim construction and how we didn't infringe.  It was slightly over my head and slightly over their head, I believe.").)

115.    VDG became interested in acquiring the '513 Patent because it "was active in designing and manufacturing exercise equipment and other products for many leading companies in the fitness industry."  (Doherty Decl. Exhibit 3 (Villency Dep.), at 43:6-12; 46:9-49:5; *see also* Doherty Decl. Exhibit 2 (Coffey Dep.), at 115:3-116:2.)

██  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████; Doherty Decl. Exhibit 2 (Coffey Dep.), at 104:1-105:5; 109-12-23.)

117.     No prior communication with Microsoft had been initiated on VDG's behalf. (*Id.* at 107:3-8.)



122.     Coffey and Villency told Foley that they had acquired the '513 Patent at a meeting at the Soho House on or about August 10, 2016. (Doherty Decl Exhibit 2, at 169:10-12; 170:15-24; *see also* Doherty Decl. Exhibit 10 (Foley Dep.), at 340:10-341:3.)  During that meeting they told Foley that they had come to him first, and that they were "giving [Peloton] first look" (Doherty Decl. Exhibit 2 (Coffey Dep.), at 174:12-16).

123.     By email dated August 10, 2016, Stanton inquired about the cost of purchasing the '513 Patent from VR Optics but took no further action. (Doherty Decl. Exhibit 59; Doherty Decl. Exhibit 12 (Stanton Dep.),, at 229:22-230:7; 230:17-23.)The Peloton Bike

124.    The Peloton Bike "may be mechanically pedaled regardless of whether the device has power." (Doherty Decl. Exhibit 60, at 4-5.)

██ ██ ████████████████████████████████████████████████████████████████

████████████████████████████████████████████

██ ██████████████████████████████████████████████

████████████████████████████████████████████; *see also id.* at 158:18-21

("There's a part of the interface [on the Peloton Bike and the Peloton Tread] where you can tap 'just ride' or 'just run' depending on if you're on a treadmill or a bike").)

██ ████████████████████████████████████████████████████

██████████████████████████████████████████████████

██ ████████████████████████████████████████████

████████████████████

██ ██ Peloton's expert confirmed that the ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██ ██

**Peloton's Lawsuit Against Flywheel**

130.  On November 19, 2018, Peloton filed a patent infringement lawsuit against Flywheel Sports, Inc. ("Flywheel") in the United States District Court for the Eastern District of Texas.  (Doherty Decl. Exhibit 11.)

131.  In the Flywheel Complaint, Peloton delineates in detail the conception and production of the Peloton Bike and did not attribute to VDG any role whatsoever in the conception or production of the Peloton Bike's interactive technology.  (*See id.* at ¶¶ 23-37.)

132.  On May 30, 2019, the Hon. Roy S. Payne, U.S.M.J., entered an Order denying Flywheel's motion to transfer the matter to the Southern District of New York, noting that Peloton had "argue[d] that VDG 'was involved solely in the design of the physical Peloton bike' and 'had zero involvement with any of the patented technology at issue in this case.'"  (Doherty Decl. Exhibit 64, at 4.)

     Respectfully submitted,

  s/ Paul S. Doherty III           
Paul S. Doherty III, Esq.
Mark A. Berman, Esq.
Jeremy B. Stein, Esq.
Janel Alania, Esq.
**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
800 Third Avenue, 28th Fl.
New York, NY 10022
 (212) 344-4619
pdoherty@hdrbb.com

*Attorneys for Plaintiff and Third-Party
Defendants*

Dated: July 1, 2019