# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

VR OPTICS, LLC,

     Plaintiff,

v.

PELOTON INTERACTIVE, INC., a Delaware
Corporation,

     Defendant.

_____

PELOTON INTERACTIVE, INC.,

     Third-Party Plaintiff,

v.

VILLENCY DESIGN GROUP, LLC, ERIC
VILLENCY and JOSEPH COFFEY,

     Third-Party Defendants.

Civil No. 16-6392 (JPO)

---

# PLAINTIFF AND THIRD-PARTY DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Paul S. Doherty III, Esq.
Mark A. Berman, Esq.
Jeremy B. Stein, Esq.
Janel Alania, Esq.
**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
800 Third Avenue, 28th Floor
New York, NY 10022
(212) 344-4619
pdoherty@hdrbb.com

*Attorneys for Plaintiff VR Optics, LLC and Third-Party Defendants Villency Design Group, LLC, Eric Villency, and Joseph Coffey*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ............................................................................................... 1

RELEVANT BACKGROUND ................................................................................................. 1

ARGUMENT ............................................................................................................................. 4

    I.    VDG IS ENTITLED TO SUMMARY JUDGMENT ON PELOTON'S
        BREACH OF CONTRACT CLAM. ................................................................ 4

        A.    VDG Did Not Breach Any Representation or Warranty. ................................ 5

            1.    VDG Only Represented That VDG's Own Design Did Not
                Infringe Any Other Parties' Intellectual Property. ............................... 5

            2.    VDG Did Not Provide the Interactive Technology Peloton Uses
                to Simulate Exercise Classes, Which Is the Technology that
                VRO Claims Infringes the '513 Patent. ............................................... 8

        B.    Peloton Did Not Rely on VDG's Representation and Warranty. ................... 13

        C.    VDG Did Not Breach Section 1.1(g) of the 2014 Agreement. ....................... 14

    II.    VDG IS ENTITLED TO SUMMARY JUDGMENT ON PELOTON'S
        FRAUDULENT CONCEALMENT CLAIM. .......................................................... 15

        A.    The Alleged Failure to Disclose Could Not Have Induced Peloton to Enter
            into the Agreements. ...................................................................................... 16

        B.    Peloton Did Not Rely to its Detriment on the Alleged Failure to Disclose. .... 17

    III.    VDG DID NOT BREACH THE DUTY OF GOOD FAITH AND FAIR
        DEALING ............................................................................................................. 19

    IV.    VILLENCY, COFFEY, AND VRO ARE ENTITLED TO SUMMARY
        JUDGMENT ON PELOTON'S CLAIM FOR TORTIOUS INTERFERENCE
        WITH CONTRACT ............................................................................................. 24

CONCLUSION ......................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
  175 F. Supp. 3d 44 (S.D.N.Y. 2016) ...................................................................... 25

*Ari & Co. v. Regent Int'l Corp.*,
  273 F. Supp. 2d 518 (S.D.N.Y. 2003) ................................................................... 20

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ...................................................................................... 20, 21

*Fasolino Foods Co. v. Banca Nazionale del Lavoro*,
  961 F.2d 1052 (2d Cir. 1992) ............................................................................ 22, 23

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998) ..................................................................... 20

*Gruppo, Levey & Co. v. ICOM Info. & Communs., Inc.*,
  2003 U.S. Dist. LEXIS 11213 (S.D.N.Y. July 1, 2003).......................................... 20

*Highland Capital Mgmt., L.P. v. Schneider*,
  533 F. Supp. 2d 345 (S.D.N.Y. 2008) .................................................................... 17

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
  681 F.3d 1323 (Fed. Cir. 2012) ............................................................................. 12

*Interallianz Bank AG v. Nycal Corp.*,
  Civil No. 93-5024, 1994 WL 177745 (S.D.N.Y. May 6, 1994).............................. 23

*Koenig v. Boulder Brands, Inc.*,
  995 F. Supp. 2d 274 (S.D.N.Y. 2014) .................................................................... 13

*Konecranes, Inc. v. Cranetech, Inc.*,
  No. 03 Civ. 6082, 2005 WL 246916 (W.D.N.Y. Feb. 2, 2005).............................. 22

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ............................................................................................ 25

*Law Debenture Tr. Co. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010) ..................................................................................... 8

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ................................................................................... 17

*M/A-Com Sec. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990) ................................................................................... 20

*M/A–COM Sec. Corp. v. Galesi*,
  904 F.2d 134 (2d Cir. 1990) ..................................................................... 22

*Manley v. AmBase Corp.*,
  126 F. Supp. 2d 743 (S.D.N.Y. 2001) ...................................................... 18

*Market St. Assocs. Ltd. Partnership v. Frey*,
  941 F.2d 588 (7th Cir. 1991) .................................................................... 24

*Mastrovincenzo v. City of N.Y.*,
  435 F.3d 78 (2d Cir. 2006) ....................................................................... 11

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
  500 F.3d 171 (2d Cir. 2007) ..................................................................... 13

*Miele v. Am. Tobacco Co.*,
  2 A.D.3d 799 (2d Dept. 2003) .................................................................. 17

*Morin v. Trupin*,
  711 F. Supp. 97 (S.D.N.Y. 1989) ............................................................ 19

*Ray Legal Consulting Grp. v. DiJoseph*,
  37 F. Supp. 3d 704 (S.D.N.Y. 2014) ........................................................ 22

*State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*,
  374 F.3d 158 (2d Cir. 2004) ..................................................................... 25

*Suthers v. Amgen Inc.*,
  441 F. Supp. 2d 478 (S.D.N.Y. 2006) ...................................................... 22

*TVT Records v. Island Def Jam Music Grp.*,
  412 F.3d 82 (2d Cir. 2005) ....................................................................... 16

*United Merchandise Wholesale, Inc. v. IFFCO, Inc.*,
  51 F. Supp. 3d 249 (E.D.N.Y. 2014) ........................................................ 17

## PRELIMINARY STATEMENT

Peloton Interactive Inc. ("Peloton") is now a $4 billion company, built on the success of its fitness products, the Peloton Bike and the Peloton Tread. On the road to this success, however, Peloton infringed existing intellectual property rights. Peloton's founders knew from the start that the interactive technology they were using in their fitness products was already the subject of a preexisting patent. Peloton nevertheless decided to take a gamble and move forward, knowing full well that the patent existed and posed a threat to its business, but hoping that no one would assert the patent against it.

Plaintiff VR Optics, LLC ("VRO") bought the patent in July 2016, and filed this patent infringement lawsuit against Peloton in August 2016. Faced with massive liability, Peloton concocted a theory under which VRO and/or Third-Party Defendant Villency Design Group ("VDG") – the company that designed the unique and eye-catching physical bike frame for Peloton – were somehow responsible for Peloton's patent infringement. As discussed below, Peloton's counterclaim and third-party claims all fail because VDG was hired to design a cool-looking stationary bike frame, and that is exactly what it did, by creating what Peloton calls a "beautiful" and "iconic" aesthetic design. VDG was not hired to create the technology used in Peloton's products, and VDG certainly was not hired to be Peloton's patent counsel or search agent. Indeed, Peloton admits that it did not rely on VDG for such purposes. Peloton knew it was infringing on the patent, and Peloton alone is responsible for its own conduct.

## RELEVANT BACKGROUND

Plaintiff and Third-Party Defendants incorporate herein, and respectfully refer the Court to, their Local Rule 56.1 Statement of Material Facts. For ease of reference, Plaintiff and Third-Party Defendants provide the following summary of the relevant facts:

In 2011, John Foley set out to develop a fitness bike platform that would simulate, at home, the experience of a live, interactive cycling fitness class by connecting individual users to one another through the internet. In 2012, Foley, along with a group of "tech leaders," founded Peloton Interactive, Inc. to develop this product (the "Peloton Bike") and bring it to market. This technology, however, was already patented under Patent 6,902,513 "Interactive Fitness Equipment" (the "513 Patent" or "Patent"). Foley and the other founders of Peloton were aware of the '513 Patent already in 2012, and they hired patent counsel ████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████ Peloton then made a business decision *not* to purchase the Patent and to proceed with developing and marketing the Peloton Bike.

Part of Peloton's plan was to design an eye-catching bike frame, to be coupled with Peloton's own interactive technology that would simulate the fitness class experience. Foley saw the spin bike that VDG had designed for SoulCycle, another company in the fitness bike space, and thought that the design stood out. Peloton approached VDG to discuss retaining VDG to design the physical bike. In April 2012, Peloton and VDG entered into the Design, Development and Manufacturing Agreement (the "2012 Agreement"). (*Id.* ¶ 53; Doherty Decl. Ex. 17.) Under the 2012 Agreement, VDG agreed to design for Peloton the physical bike frame, including the non-technological elements appended to the frame like the pedals and handlebars, and to source and manage the relationship with a Taiwanese manufacturer of the physical bike frame. VDG represented to Peloton that the physical bike frame would be an original work and would not infringe on any existing intellectual property. VDG *did not* agree to (and did not) design or provide the interactive technology used to simulate the interactive fitness experience. Nor did VDG's principals, Eric Villency and Joseph Coffey, have the educational background or experience in

computer programming or electrical engineering necessary to contribute such technology. Villency took over his grandfather's furniture design business, and made a career designing things like workout benches and dumbbells and other fitness accessories, and Coffey is a non-practicing attorney. Peloton's founders, on the other hand, had both the relevant educational background and business experience, especially Yony Feng, whom Peloton refers to as its "technological guru." As Peloton's COO admitted at his deposition, Peloton certainly did not rely on any representation from VDG about whether the interactive technology Peloton coupled with the bike frame VDG designed did or did not infringe any existing intellectual property. VDG did not make any such representation, was incapable of making any such representation, and it would have been absurd for Peloton to ask for or rely on any such representation from VDG.

Peloton was ecstatic with the bike frame VDG designed. As one of the founders put it,

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████

In 2014, Peloton and VDG renegotiated their arrangement and entered into the Bike Development and Services Agreement (the "2014 Agreement"). (*Id.* ¶ 89; Doherty Decl. Ex. 45.) Under the 2014 Agreement, VDG continued to be responsible for managing the manufacture of the bikes and also took on the additional responsibility of handling customer returns. But even as the parties were entering into the 2014 Agreement, Peloton already had begun to think of the relationship as ████████████████████████████████ In January 2015, Peloton transitioned in-house, away from VDG, oversight of the manufacture of the bikes and then notified VDG that VDG would no longer be handling the return service. By the time the two-year term of

the 2014 Agreement ended in June 2016, VDG had played virtually no role for more than six months.

In or about January 2016, VDG separately began looking into the possibility of purchasing the '513 Patent. The inventor of the '513 Patent was Daniel McClure. Microsoft Corporation purchased the Patent from McClure in 2012. In June 2016, Coffey and Villency formed a new entity, VR Optics, LLC, and that entity purchased the '513 Patent from Microsoft. Coffey and Villency offered to license the Patent to Peloton, but Peloton declined. In August 2016, VRO filed this case, asserting claims of patent infringement against Peloton.

## ARGUMENT

### I.  VDG IS ENTITLED TO SUMMARY JUDGMENT ON PELOTON'S BREACH OF CONTRACT CLAM.

Count One of Peloton's Amended Third-Party Complaint alleges that, "[t]o the extent that the Peloton Bike infringes on the '513 Patent," as alleged by VRO in this case, "Villency Design Group breached the [2012 Agreement and 2014 Agreement] whenever it represented and warranted under each agreement that the Peloton Bike did not infringe upon the rights of any third parties" and "breached the [2012 Agreement and 2014 Agreement] because it represented and warranted under each agreement that the Peloton Bike would not infringe upon the rights of any third parties." (Am. Third-Party Compl. ¶¶ 76, 79.) Peloton's breach of contract claim fails because, under the plain language of the agreements, VDG only represented that the physical bike frame design it provided under the agreements – its own work –would not infringe any intellectual property right and Peloton does not (and cannot) claim that that physical bike frame design infringes on the '513 Patent. It does not.

VRO's patent infringement claim is that the technology Peloton uses to coordinate communication among its bikes (and other fitness equipment) to simulate an interactive exercise

event, like an exercise class, infringes the '513 Patent. (*See* Compl. ¶¶ 9-10, 14-15.) VDG did not provide this technology to Peloton, and VDG did not warrant and represent that Peloton's own technology would not infringe on any third party's intellectual property rights. Therefore, VDG is entitled to summary judgment on Peloton's breach of contract claim.

### A.     VDG Did Not Breach Any Representation or Warranty.

#### 1.     *VDG Only Represented That VDG's Own Design Did Not Infringe Any Other Parties' Intellectual Property.*

Peloton alleges that, "[t]hrough both the [2012 Agreement] and the [2014 Agreement], Villency Design Group represented and warranted that the Peloton Bike does not and will not infringe upon the rights of any third parties, including any intellectual property rights." (Am. Third-Party Compl. ¶ 72.)  This allegation is contrary to the plain language of the parties' Agreements: The Agreements unambiguously provide that VDG represented that its own design work would not infringe anyone else's intellectual property rights.  VDG did not represent, and did not have the expertise, capacity, or knowledge to represent, at the time the Agreements were executed or thereafter, that the entire Peloton Bike product, in which Peloton combined VDG's design of the physical bike frame with Peloton's own and separate interactive technology, would not infringe any intellectual property then in existence. Peloton's assertion that the parties' Agreements should be interpreted to include a guarantee by VDG that the entire Peloton Bike product, conceived of by John Foley, who relied upon the counsel of his own patent attorney, did not violate any third-parties' intellectual property rights, is contrived.

It is undisputed that VDG's bike frame design did not violate any patents. (R.56.1 ¶ 128.) Peloton's allegation that VDG guaranteed more than the physical bike frame is based on a selective and misleading quotation of the language of the Agreements.  The Amended Third-Party Complaint alleges:

> In section 2.7, Villency Design Group expressly represented and warranted that, among other promises, "the Bike Intellectual Property does not and will not infringe upon the rights of any third party."

(Am. Third-Party Compl. ¶ 46 (quoting § 2.7(c) of the 2012 Agreement); *see also* Am. Third-Party Compl. ¶ 61 (quoting § 8.2(a)(3) of the 2014 Agreement).) The full text of VDG's representation, however, is as follows:

> All Bike Intellectual Property provided by Villency is, has been and will be originally created exclusively by Villency and that the Bike Intellectual Property does not and will not infringe upon the rights of any third party.

(Doherty Decl. Ex. 17 § 2.7(c) and Doherty Decl. Ex. 45 § 8.2(a)(3).) The plain, unambiguous meaning of this representation, read as a whole, is that whatever VDG creates for Peloton under the Agreements will be an original work created by VDG. It was.

The definition of "Bike Intellectual Property" also makes crystal clear that "Bike Intellectual Property" means the intellectual property rights to the work created by VDG under the Agreements and that VDG's representation regarding Bike Intellectual Property is limited to intellectual property created by VDG:

> Only upon full payment of the base fee set forth in Section 1.8(i) below, Peloton shall be the sole and exclusive owner of all intellectual property relating to the Device Bikes, including, without limitations, all designs (including without limitation, those created by Villency prior to or during the term of this Agreement), inventions, improvements, discoveries, data, concepts, ideas, processes, methods, techniques, know-how, and information respecting the Bikes conceived, made or produced by Villency prior to and/or during the course of performing the Product Development Services and/or Manufacturing Services under this Agreement, or made or produced as the result of the joint efforts of Peloton and Villency prior to or during the term of this Agreement (collectively, the "Bike Intellectual Property"). For the purpose of clarity, upon payment of the base fee, Villency agrees that all Bike Intellectual property created by Villency under this Agreement, shall be considered a specially commissioned "work for hire" as that term is used in Section 101 of the U.S. Copyright Act of 1976 (as amended), and all right, title, and interest (including, without limitation, copyrights, trademarks, and patent rights) in the Bike Intellectual Property shall belong to Peloton. To the extent that by operation of law or otherwise, Bike Intellectual Property is not deemed a work for hire, Villency hereby

- 6 -

> assigns to Peloton all right, title and interest in and to any Bike Intellectual Property created by or contributed to by Villency. Villency agrees to execute, at Peloton's request and expense, all documents and other instruments necessary or desirably to confirm Peloton's rights as set forth in this Section.

(Doherty Dec. Ex. 17 § 1.7(a).) In this provision, VDG agreed that, in exchange for payment, VDG would transfer and assign to Peloton, and Peloton would become the exclusive owner of, the Bike Intellectual Property, which can only refer to intellectual property VDG created because VDG could not agree to sell and transfer to Peloton intellectual property created by and belonging to others.

The other provisions of the Agreements regarding intellectual property confirm this interpretation. In section 1.7(b) of the 2012 Agreement, the parties agreed that "Peloton shall have the sole and exclusive right to prepare, file, prosecute and maintain trademark applications or other intellectual property registrations with respect to the Bike Intellectual Property." (Doherty Decl. Ex. 17.) Likewise, in section 1.7(b) of the 2014 Agreement, the parties agreed that "Peloton shall have the sole and exclusive right to prepare, file, prosecute and maintain trademark, trade dress, patent, copyright and/or other intellectual property applications and registrations with respect to the Bike Intellectual Property." (Doherty Decl. Ex. 45.) Again, VDG could only agree to grant Peloton these rights with respect to intellectual property VDG owned – that is, VDG's intellectual property rights in the work it was creating for Peloton under the Agreements. It was not within VDG's power to grant any other intellectual property rights to Peloton. "Bike Intellectual Property" clearly only refers to VDG's rights in what VDG itself created.

VDG also reserved for itself some continuing use of the Bike Intellectual Property. In the 2012 Agreement, the parties agreed:

> VILLENCY USE OF BIKE INTELLECTUAL PROPERTY. Villency shall be permitted to use the industrial design and photo renderings of the Bikes for its own promotional and marketing efforts including but not limited to

press releases, website, case studies and presentations, to the extent the Bikes have been published or displayed to the general public.

(Doherty Decl. Ex. 17 § 1.9.)  In the 2014 Agreement, the parties agreed:

VILLENCY USE OF BIKE INTELLECTUAL PROPERTY. Villency shall be permitted to use the industrial design, actual bike and photo renderings of the Bikes for its own promotional and marketing efforts including but not limited to press releases, website, case studies, television appearances and presentations.

(Doherty Decl. Ex. 45 § 1.9.)  If "Bike Intellectual Property" meant any intellectual property at all related to the Peloton Bike, even if not created by VDG, it would make no sense for the parties to agree that VDG could retain rights with respect to that intellectual property because VDG never owned it or had any rights to it in the first place.

Reading the Agreements as a whole, it is clear that "Bike Intellectual Property" means the intellectual property rights to the work created by VDG itself and that VDG only represented that the work VDG itself contributed would not infringe any other person's intellectual property rights. *See Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467-68 (2d Cir. 2010) (noting that contract clauses must be "read in the context of the entire agreement," and "[t]he court should read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases").  Therefore, VDG is entitled to summary judgment.

> 2.    *VDG Did Not Provide the Interactive Technology Peloton Uses to Simulate Exercise Classes, Which Is the Technology that VRO Claims Infringes the '513 Patent.*

It is undisputed that VDG's bike frame design does not violate the '513 Patent or any other third-party intellectual property. (R.56.1 ¶ 128.)  Moreover, it is clear that VDG did not provide the interactive technology Peloton uses to simulate exercise classes, which is the technology that VRO claims violates the '513 Patent. Therefore, VDG is entitled to summary judgment on Peloton's breach of contract claim.

VRO claims that Peloton's Bike and Tread products, and the technology Peloton uses to enable its fitness equipment to communicate with each other, infringe the '513 Patent. The invention of the '513 Patent "is generally directed to a computerized fitness equipment that is designed to simulate, emulate, or implement actual race conditions with other users" through the use of "sensors to monitor performance parameters," a visual display, and a "communication interface … to communicate the first performance parameters to at least one remote, similarly configured, fitness equipment." The equipment also includes "logic to provide a visual display of a user's performance (as measured by the first performance parameters)" and "logic to compare" the performance parameters of one user with those of the other, remote user, and "display the results in a comparative fashion to the user." (R.56.1 ¶ 101.) Like the invention claimed in the '513 Patent, Peloton's technology coordinates communication among fitness equipment through its servers to simulate interactive exercise events, such as spinning classes. (Doherty Decl. Ex. 64 (Supplemental Infringement Contentions) at 3, 6, 8-9, 27-28, 31-32.) Each Peloton Bike and Tread uses sensors to generate performance parameters, such as total output obtained using a speed sensor and a resistance sensor on the Peloton Bike and a speed sensor and an incline sensor on the Tread. Total output and other performance parameters are sent to Peloton servers. Peloton ranks the total output value and sends the rankings and total outputs to other Bikes and Treads so that users can see these rankings and total output values on displays on their equipment in the form of a leaderboard. (*See, e.g.*, *id.* at 8-11, 14-15, 26-28, 31-32.)

There is no dispute that VDG did not invent any of the interactive technology for Peloton:

- According to Peloton's CEO, John Foley, he was the one who conceived of the concept behind Peloton, that is, the "hardware and software platform that is Peloton [that] allows you to consume these classes, to take this content, from the convenience of your own home." (R.56.1 ¶ 26.) The name Foley chose for the company, "Peloton Interactive," refers to "a group of riders that ride together to conserve energy. It's the lead pack of a cycling race," and the ███████████████████████

- In its patent infringement complaint against Flywheel Sports,[1] Peloton alleges in detail what it calls "The Journey to Inventing the Peloton Bike." Peloton tells how Foley first came up with the idea for providing the interactive cycling experience at home, and how Foley recruited "other tech leaders who shared his vision." Those "tech leaders" were Peloton's other founders, Tom Cortese, Graham Stanton, Hisao Kushi, and Peloton's "technological guru" Yony Feng. According to Peloton, it was Feng who developed the "hardware-software integration" that was "the basis for Peloton's prototype" and the interactive technology at the core of Peloton's products. (Doherty Decl. Ex. 11 ¶¶ 1, 23-37.)

- Peloton does not mention VDG, Eric Villency, or Joe Coffey even once in its recounting in the Flywheel pleading of how the Peloton Bike came to be. (*Id.* ¶¶ 23-37.) Indeed, the District Court in the Eastern District of Texas, where the Flywheel case is venued, recently relied on Peloton's assertion in that case that "VDG was involved solely in the design of the physical Peloton bike and had zero involvement with any of the patented technology at issue in this case," finding that Villency and Coffey would not be able to provide information that has any significant relevance regarding the Flywheel case, in which the '513 Patent is a factor. (R.56.1 ¶ 132.)

- As for VDG's role, Foley testified at his deposition in this case that he turned to VDG after he saw a "rendering of the SoulCycle bike," which "has been celebrated from its – I want to say industrial design, but certainly its look. I think the bright yellow does some things that made it feel different than what was … in the category." (*Id.* ¶ 47.)

- VDG provided "creative direction in the form factor" of the Peloton bike frame. (*Id.* ¶ 71.) VDG took its visual inspiration from "outdoor bikes," and their "carbon fiber [and] sweeping lines." (*Id.*) VDG attended to multiple aesthetic details of the physical bike design, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ designing the handlebars and the seat, consulting on ergonomics, usability and comfort, creating a "clean" appearance using a "belt drive" instead of a "chain-driven bike that needs grease," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶¶ 74-76.) None of this bears any relation to the '513 Patent.

- VDG initially managed Peloton's relationship with the Taiwanese manufacturer of the bike, Tonic, but Peloton itself managed its relationship with Innocom, which was the manufacturer of the flat screen interactive console. (*See* R. 56.1 ¶¶ 63-69.) VDG did not perform any software programming, had no input into the operation of the leaderboard servers, did not design or manufacture the console or the sensors, and was not involved in the creation of Peloton's live-streaming content and socially networked functions. (*Id.* ¶¶ 79-80.)

---

[1] *Peloton Interactive, Inc. v. Flywheel Sports, Inc.*, No. 18-cv-390 (E.D. Tx.) (hereinafter, "*Flywheel*").

- Neither Eric Villency nor Joseph Coffey have any of the training or experience in electrical or computer engineering necessary to create the interactive technology. Eric Villency holds a B.A. in English from the University of Wisconsin. In 2002, Villency became CEO of the custom furniture design firm his grandfather had founded. Joe Coffey has a B.A. in Economics from Lafayette College and a J.D. from St. John's University. (*Id.* ¶¶ 3-6.) Eric Villency and Joe Coffey did not invent or provide the interactive technology included in the Peloton Bike. (*See, e.g.*, Nov. 5, 2018 Markman Opinion, ECF Doc. No. 112, at 6-7 (finding that a person of ordinary skill in the art with respect to the invention claimed in the '513 Patent "would be an engineer with at least a bachelor's level degree in engineering and two or more years' experience working as an engineer designing and/or developing computerized fitness or exercising equipment").)[2]

- Yony Feng, on the other hand, holds both Bachelor of Science and Master of Science degrees in Electrical and Computer Engineering from the Georgia Institute of Technology, and worked as a software engineer for a variety of companies prior to joining Peloton. (R.56.1 ¶¶ 40-41.) And, each of the other founders of Peloton has either relevant educational background or practical experience in the tech sector. (*Id.* ¶¶ 27-29, 32-33, 35-37, 45.)

- After VDG designed the bike frame, Peloton COO Tom Cortese acknowledged and summarized VDG's contribution:

Since there can be no dispute that VDG did not provide to Peloton the interactive technology that infringes the '513 Patent, VDG did not breach any representation or warranty in the Agreements.

Nevertheless, Peloton may argue that VDG's physical bike design "contributorily infringes" on the '513 Patent and, therefore, VDG breached its representation, even if VDG did not provide the interactive technology that infringes the '513 Patent. This argument fails for two reasons. First, as discussed above, the 2012 and 2014 Agreements are unambiguous: VDG only represented that

---

[2] For these same reasons, given Villency and Coffey's backgrounds, it would be absurd to interpret the Agreements to include a representation from them as to whether Peloton's interactive technology infringed the '513 Patent; Villency was sought out for his design expertise, not for any patent expertise. Therefore, the Agreements cannot possibly be read to include any such representation. *See Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006) ("[T]he cardinal principle for the construction and interpretation of . . . all contracts . . . is that the intentions of the parties should control. Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.").

VDG's own work would not infringe any other person's intellectual property rights. (Doherty Decl. Ex. 17 § 2.7(c) and Ex. 45 § 8.2(a)(3).) This representation is undeniably true: the bike design provided by VDG was VDG's original creation, no one has claimed otherwise and, therefore, VDG did not infringe on any third-party's intellectual property.

Second, there is no dispute that the physical bike design does not contributorily infringe the '513 Patent. As the Court explained in its Opinion on VDG's motion to dismiss:

> Contributory infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that "material or apparatus" is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent. Contributory infringement requires, among other things, that the components sold or offered for sale have no substantial non-infringing uses.

(Docket #57 ("MTD Opinion") at 6 (*quoting In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012)).) Peloton's own expert



Peloton's expert also testified that

Likewise, Peloton's founders testified

Thus, Peloton and its expert confirmed what is self-evident: ███████████████████████
████████████████████████████████████████████████████████████ That is, it has a substantial non-infringing use. (*See* MTD Opinion at 7 ("Certainly, if there is no contributory or direct infringement of the product created pursuant to the Agreements, there is no breach of contract.").)

      **B.**      **Peloton Did Not Rely on VDG's Representation and Warranty.**

Even assuming *arguendo* that the Agreements could be interpreted to mean that VDG represented to Peloton that the final Peloton Bike, including its interactive technology, did not and would not infringe *any* intellectual property rights whatsoever, Peloton's breach of contract claim would still fail because Peloton did not, and could not, rely on any such representation. Therefore, VDG is entitled to summary judgment on Peloton's breach of contract claim.

To prove a breach of an express warranty claim, a plaintiff must prove that the plaintiff relied on the express warranty to their detriment. *See, e.g.*, *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 289 (S.D.N.Y. 2014) ("To state a claim for breach of express warranty, a plaintiff must allege that there was an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon to the plaintiff's detriment."); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("The plaintiff must show that it believed that it was purchasing seller's promise regarding the truth of the warranted facts."). Here, Peloton admits that it did not rely on VDG to represent that the interactive technology did not infringe the intellectual property rights of any third party. As Cortese testified:

> "Q. … You were not going to rely on any representation regarding the '513 patent that may have been provided to you by Villency Design Group, correct? …
>
> A. To my knowledge, no. …

> Q. Peloton was not relying on Villency Design Group to tell Peloton whether or not the '513 patent was infringed by the Peloton bike, correct?
>
> A. We did not ask Villency Design Group for an official opinion on the '513 Patent, to my knowledge, no."

(Doherty Decl. Ex. 9, at 325:5-326:5.)  To the contrary, Peloton independently learned of the '513 Patent in 2012, and Peloton engaged intellectual property counsel, Jonathan Hangarten, Esq. – whom John Foley described as "the best patent counsel on the planet" – to determine the potential impact of the '513 Patent on Peloton's business.  (*See* R.56.1 ¶ 103-06.)  Hangartner emailed Peloton ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████  Peloton then chose not to purchase '513 Patent and to proceed with developing the Peloton Bike and bringing it to market.  (R.56.1 ¶ 106.)

Thus, there is no dispute that Peloton did not rely on any representation from VDG as to whether the Peloton Bike infringed on the '513 Patent.  Indeed, it would be ludicrous for Peloton to rely on VDG – whose principals are a furniture designer and a non-practicing attorney, with no relevant experience or training – to determine whether a patent on an interactive computerized system was valid or not and whether a particular tech product infringed that patent or not.[3]  Therefore, Peloton cannot prove reliance as a matter of law.

### C.    VDG Did Not Breach Section 1.1(g) of the 2014 Agreement.

Peloton claims that "Villency Design Group's failure to communicate with Peloton as to possible infringement after it learned of the '513 Patent breached Villency Design Group's responsibility to give Peloton periodic updates about development issues under the Peloton Bike

---

[3] Peloton's claim for indemnification is entirely contingent on its claim that VDG breached its representation regarding intellectual property.  (*See* Am. Third-Party Compl. ¶¶ 83-86.)  Because VDG did not breach that representation, Peloton's claim for indemnification fails.

Development Agreement." (Am. Third-Party Compl. ¶ 82.) Presumably, Peloton is referring to Section 1.1(g) of the 2014 Agreement, which provides that "Villency shall in accordance with the Schedule, communicate on a weekly basis, by written report to Peloton, all Bike development progress and issues." (Doherty Decl. Ex. 45 § 1.1(g).) First, as discussed above, Peloton already knew about the '513 Patent in 2012 and discussed possible infringement with its own patent counsel. Second, this provision has absolutely nothing to do with intellectual property; the reporting required was about the ongoing manufacturing of the bikes by Peloton's manufacturer in Taiwan, Tonic. The "Schedule" Section 1.1(g) refers to is attached to the 2014 Agreement, and it lists out the manufacturing information VDG was required to provide to Peloton, which included "importation update detailing containers in transit and scheduled docking dates," "status update on production," "factory inspections," and a "QC [quality control] report." (*Id.* at Ex. A.) This is the information VDG was required to report to Peloton, not "possible infringement." Peloton is relying on this provision only because it cannot locate any express obligation in the Agreements to disclose what it calls "possible infringement." Because there was no obligation in the contract to provide patent compliance advice, VDG has not breached the contract.

## II. VDG IS ENTITLED TO SUMMARY JUDGMENT ON PELOTON'S FRAUDULENT CONCEALMENT CLAIM.

Count Two of Peloton's Amended Third-Party Complaint alleges that VDG had "superior knowledge of Mr. Villency's and Mr. Coffey's efforts to acquire the '513 Patent and their impending infringement suit" and that VDG fraudulently concealed "the imminent likelihood of an infringement claim against the Peloton Bike." (Am. Third-Party Compl. ¶¶ 90-91.) Peloton claims that, had it known of the potential infringement, it would not have entered into the Agreements, and that it "could have purchased" the Patent itself. (Am. Third-Party Compl. ¶¶ 95-96.) These claims fail because Peloton did not rely to its detriment on any alleged failure to

disclose. Peloton entered into the Agreements in 2012 and 2014, years before VDG purchased the Patent; thus, Peloton did not enter the Agreements based on any failure to disclose.[4]  Further, Peloton received from VDG the products and services it bargained for under the Agreements, and it was by no means damaged by entering into the Agreements.  As for potentially purchasing the Patent, Peloton knew about the '513 Patent as early as April 2012, but made an affirmative decision *not* to purchase the patent.  Indeed, even when Coffey and Villency offered to license the Patent to Peloton, in August 2016, before this litigation began, Peloton declined.  Thus, even if VDG failed to disclose that it intended to assert the '513 Patent against Peloton, that failure to disclose did not cause any damage to Peloton because Peloton affirmatively decided not to acquire the Patent and to run the risk that the patentholder (whoever that might be) might assert the Patent against Peloton in the future.  Therefore, VDG is entitled to summary judgment.

### A.    The Alleged Failure to Disclose Could Not Have Induced Peloton to Enter into the Agreements.

"New York recognizes a cause of action to recover damages for fraud based on concealment where the party to be charged has superior knowledge, such that the *transaction* without disclosure is rendered inherently unfair."  *Miele v. Am. Tobacco Co.*, 2 A.D.3d 799, 803 (2d Dept. 2003) (emphasis added) "As several district courts have suggested, such a duty [to disclose] usually arises … in the context of business negotiations where parties are *entering* a contract."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (emphasis added) (internal

---

[4] To the extent Peloton's claim for fraudulent concealment is based on a failure to disclose that the representation regarding intellectual property was going to be breached, that claim fails on its face because inducing a counterparty to enter a contract by failing to disclose an intent to breach that contract cannot be the basis of a claim for fraudulent concealment.  *See TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) ("[T]he intention to breach does not give rise to a duty to disclose.  Instead, the duty to disclose must exist separately from the duty to perform under the contract.").  Of course, the claim also fails because there was no breach of the representation, because VDG never made any representation regarding the non-infringement of the interactive technology, as discussed above.

quotation marks omitted) (collecting cases). The "typical fraudulent concealment case involves a plaintiff who, following a material omission by defendant, unwittingly *enters into* an agreement." *Highland Capital Mgmt., L.P. v. Schneider*, 533 F. Supp. 2d 345, 358 (S.D.N.Y. 2008); *United Merchandise Wholesale, Inc. v. IFFCO, Inc.*, 51 F. Supp. 3d 249, 270-72 (E.D.N.Y. 2014) (concluding that plaintiff had not shown that defendant had a duty to disclose where defendant did not know that plaintiff was "acting on the basis of mistaken knowledge when *entering into* the … agreement.") (emphasis added) (citation omitted).

Here, there is no dispute that VDG's alleged failure to disclose its purchase of the '513 Patent, and intention to assert it, post-dated entry into the 2012 and 2014 Agreements: ███████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ On June 20, 2016, Coffey and Villency formed VRO and, ████████████████████████████████████████ ████████████████████████████ (*Id.* ¶¶ 15, 120.) Thus, there was *nothing* to disclose to Peloton in 2012 or 2014 regarding the purchase of the '513 Patent. Accordingly, Peloton's claim for fraudulent concealment, based upon a fact that did not come into existence until, at the earliest, January 2016, fails because the alleged failure to disclose post-dates the parties' entry into the 2012 and 2014 Agreements and could not have caused Peloton to enter into the Agreements and did not render the transaction of entering into the Agreement in any way unfair.

**B.      Peloton Did Not Rely to its Detriment on the Alleged Failure to Disclose.**

To prove a claim for fraudulent concealment, a plaintiff must prove damages caused by reliance upon the fraudulent concealment. *Manley v. AmBase Corp.*, 126 F. Supp. 2d 743,758 (S.D.N.Y. 2001) ("In order to prove reliance, [plaintiff must] demonstrate that it was induced to act or refrain from acting to its detriment by virtue of the alleged misrepresentation or omission.") (internal quotation marks and citations omitted). Here, even if Peloton had been induced to enter

the Agreements by VDG's alleged failure to disclose its future purchase of the '513 Patent (which, as discussed above, is impossible because of the timing), Peloton was not damaged as a result.

Peloton's founders admit that they received from VDG exactly what they bargained for under the Agreements. Cortese testified that VDG performed its obligations under the 2012 Agreement in full. (R. 56.1 ¶ 84.) Peloton also paid VDG in full under the 2012 Agreement and never served a default notice or terminated the Agreement. (*Id.* ¶ 83.) Peloton also extended the parties' relationship by entering into the 2014 Agreement. Peloton never sent any default notices or terminated that Agreement and paid VDG in full. (*Id.* ¶¶ 98-99.) The 2014 Agreement was limited to a two-year term and, at the end of the term, Peloton did not enter into a further agreement with VDG because, at that point, there was no further design work; indeed, Peloton had chosen to bring VDG's other functions in-house even before the term of the 2014 Agreement had expired. (*Id.* ¶¶ 95-97.) Summing up Peloton's view on VDG's performance, Cortese gushed ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Thus, even if Peloton was induced to enter into the Agreements with VDG as a result of some failure to disclose, Peloton was not damaged as a result because Peloton received what it bargained for under the Agreements.

In addition, Peloton knew about the '513 Patent as early as April 2012, consulted with patent counsel, and made the affirmative decision not to purchase the Patent and run the risk of a patent infringement lawsuit by whomever the owner of the Patent happened to be. A patent infringement lawsuit was a risk, regardless of whether Peloton entered into the Agreements with VDG, or VRO's imminent purchase of the Patent was disclosed, because the Patent existed, Peloton knew about it, but decided not to purchase the Patent long before VRO purchased it. Coffey and Villency even offered to license the Patent to Peloton in August 2016, before they

offered it to anyone else, but even then, Peloton affirmatively decided not to license or purchase the Patent, instead choosing to risk an infringement suit. (R. 56.1 ¶¶ 122-23.) Therefore, VDG was not in a superior position to Peloton, which knew of and accepted the risk of a patent infringement lawsuit by the owner of the '513 Patent, whoever that might be. *See Morin v. Trupin*, 711 F. Supp. 97, 103 (S.D.N.Y. 1989) ("Furthermore, 'a duty to disclose will not be imposed unless there is evidence that defendants were 'on notice' that plaintiffs were acting upon a mistaken belief based on inferior information.'"). Therefore, VDG is entitled to summary judgment on Peloton's fraudulent concealment cause of action.

## III. VDG DID NOT BREACH THE COVENANT OF GOOD FAITH AND FAIR DEALING.

Count Three of Peloton's Amended Third-Party Complaint alleges a claim against VDG for breach of the covenant of good faith and fair dealing premised upon the allegation that, "[i]n order to deprive Peloton of the benefits of each of the Peloton Bike Design Agreement and the Peloton Bike Development Agreement, Villency Design Group ... formed VR Optics to acquire the '513 Patent and assert it against Peloton" (Am. Third-Party Compl. ¶ 101), and that "[b]y forming VR Optics, acquiring the '513 Patent, and asserting the '513 Patent against Peloton, Villency Design Group acts to withhold the benefits of both the Peloton Bike Design Agreement and the Peloton Bike Development Agreement from Peloton" (*id.* ¶ 102). VDG is entitled to summary judgment because the parties entered into a very specific, arms-length contract in which the parties laid out in detail exactly the competitive conduct VDG was prohibited from engaging in. Asserting a patent infringement claim is not one of the things VDG was barred from doing, and Peloton cannot now expand the scope of that negotiated provision via a claim for breach of the duty of good faith and fair dealing. The parties' Agreements also specify the services VDG was to perform for Peloton, and there is no dispute that VDG performed those services to Peloton's

overwhelming approval. Because Peloton received the full benefit it bargained for, VDG is entitled to summary judgment on Peloton's breach of the duty of good faith and fair dealing claim.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). "This [covenant] embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. .... The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Id.* (internal citations omitted). Thus, "[t]he boundaries of the duty do not ... extend so far as to prevent a party from acting in its own interests even if the result is to incidently [sic] lessen the value the other party expected to receive from the contract." *Gruppo, Levey & Co. v. ICOM Info. & Communs., Inc.*, 2003 U.S. Dist. LEXIS 11213, at *28 (S.D.N.Y. July 1, 2003) (*citing M/A-Com Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). *See also Ari & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) ("The Second Circuit has indicated that it is the 'intent and reasonable expectations' of parties entering into a given contract that fix the boundaries of the covenant of good faith and fair dealing, provided that those expectations are consistent with the express terms of the contract."); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 (S.D.N.Y. 1998) (holding that the duty of good faith and fair dealing "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract[s].").

Here, the parties specifically identified in the Agreements the competitive activity VDG was barred from, which included "enter[ing] into any agreement or relationship with any third party to design, develop and/or manufacture a stationary exercise bicycle that does not have a

freewheel (commonly called a 'spin' bike) that is physically integrated with a device that is capable of displaying exercise and/or instructional content and/or communicating with users of other stationary bicycles."  (Doherty Decl. Ex. 45 § 6.1; *see also* Ex. 17 § 3.2(c).)   The Agreements do not bar VDG from other conduct competitive with Peloton.  Thus, inferring a duty of good faith and fair dealing that would prohibit VDG from competing with Peloton in a manner not specified in the parties' agreement "would be inconsistent with other terms of the contractual relationship." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).

Indeed, VDG was already in the business of designing fitness bike frames when it entered into the Agreements with Peloton; that is why Peloton first approached VDG.  (R. 56.1 ¶¶ 47-49.) The non-compete provision of the Agreements is narrowly tailored to reflect that reality.  For instance, the provision explicitly excludes from its scope "working with, and/or continuing to work with, any entity that is a client of Villency's as of the effective date of this agreement for the manufacture and distribution of stationary bicycles ('Competitive Bikes'), provided that the Competitive Bikes do not [include certain interactive features]."  (Doherty Decl. Ex. 17 § 3.2(c), Ex. 45 § 6.1.)  Peloton cannot now re-negotiate and expand this provision, via a claim for breach of the duty of good faith and fair dealing, to bar VDG from conduct it was not specifically barred from under the Agreements.

Moreover, simply because parties are in a contractual relationship does not mean that they are prohibited from acting in their own self-interest, so long as they do not violate the express terms of the contract:

> Plaintiffs have no support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract. Indeed, courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable.

*Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006); *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 726 (S.D.N.Y. 2014) ("Although Plaintiff does allege that Arent Fox 'refused to release the funds in bad faith, and with a bias for their self-interest in maintaining the confidentiality of the Settlement Agreement ...,' that allegation bespeaks neither malevolent conduct nor a purposeful scheme designed to deprive Plaintiff of receiving the escrowed funds. Rather, because Arent Fox was 'acting in [its] own self-interest consistent with [its] rights under [the] contract,' it did not breach the covenant of good faith and fair dealing."). As the Second Circuit has explained, "even after you have a signed contract, you are not obliged to become an altruist toward the other party." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1057 (2d Cir. 1992); *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (holding that a court may not construe the covenant of good faith and fair dealing to "undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.").

The parties' Agreements also specifically itemized the services VDG would provide in exchange for specified payments and there is no dispute that VDG provided those services to Peloton. (R.56.1 ¶¶ 83-84, 98-99.)  Therefore, Peloton was not denied the "benefit of its bargain" under the Agreements.  *See Konecranes, Inc. v. Cranetech, Inc.*, No. 03 Civ. 6082, 2005 WL 246916, at *3 (W.D.N.Y. Feb. 2, 2005) (holding that conduct that "deprives the plaintiff of the benefit of the bargain" can constitute a breach of the duty of good faith and fair dealing).  In particular, VDG designed for Peloton a unique and eye-catching bike frame, which has contributed to Peloton's success in becoming a multi-billion-dollar company.  (R.56.1 ¶ 77.)  VDG also agreed to provide ███████████████████████████ and repair services.  (*See id.* ¶¶ 56-59, 91-92.)  As discussed above, with respect to Peloton's fraudulent concealment claim, Peloton's

founders admitted that they received from VDG exactly what they bargained for under the Agreements, VDG performed its obligations in full, Peloton paid VDG in full, and Peloton never served a default notice or terminated the Agreements. (*Id.* ¶¶ 83-84, 98-99.) VDG did not promise to provide – and was not paid to provide – any other benefit and, conversely, Peloton was not entitled to receive any other benefit from VDG's contractual services. *See Interallianz Bank AG v. Nycal Corp.*, Civil No. 93-5024, 1994 WL 177745, at *8 (S.D.N.Y. May 6, 1994) ("The covenant [of good faith and fair dealing] does not create duties which are not fairly inferable from the express terms of that contract.") (*citing Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992)). Peloton – which is now valued at billions of dollars – was not denied any benefit it was entitled to under the parties' Agreements.

To be sure, there was a risk that someone would assert the '513 Patent against Peloton. Peloton has known about that risk since about April 2012 (R.56.1 ¶ 104) – long before Peloton entered into the 2014 Agreement. Peloton hired patent counsel, and in 2013, that counsel advised ███████████████████████████████████████████████████ Peloton then affirmatively decided *not* to acquire the Patent and to make the investment necessary to develop the Peloton Bike and to bring the product to market. (*Id.* ¶¶ 106-109.) This decision-making had nothing to do with VDG. Peloton did not pay VDG to be its intellectual property counsel, and the parties' Agreements did not implicitly give rise to any obligation (otherwise absent from the explicit terms of the parties' contracts) for VDG to share with Peloton a different assessment of the '513 Patent, because VDG was neither Peloton's patent expert nor its fiduciary. *See Market St. Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588, 593–94 (7th Cir. 1991) ("In fact the law contemplates that people frequently will take advantage of the ignorance of those with whom they

contract, without thereby incurring liability. The duty of honesty, of good faith even expansively conceived, is not a duty of candor.") (Posner, J.) (citation to Restatement omitted).[5]

The '513 Patent exists and Peloton's product either infringes it or it does not. If it does, then Peloton owes the patentholder compensation. When Peloton chose to invest and develop the product, and then not to purchase the '513 Patent, Peloton took a calculated risk that the Patent was invalid or did not infringe. The Court will determine if Peloton was right or wrong, but the reality is that Peloton is in no different a position vis-à-vis the '513 Patent now that VRO owns the Patent, as compared to anyone else: If the Peloton Bike infringes, then Peloton owes someone compensation. The parties' Agreements include no provision preventing VRO from being the one to collect that compensation, and Peloton cannot invent a new contract provision that excuses Peloton from paying it. Therefore, VDG is entitled to summary judgment on Peloton's cause of action for breach of a duty of good faith and fair dealing.

## IV. VILLENCY, COFFEY, AND VRO ARE ENTITLED TO SUMMARY JUDGMENT ON PELOTON'S CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT.

Peloton asserts a counterclaim against VRO and a third-party claim against Coffey and Villency for intentional interference with contract. These claims fail because there was no interference, no breach of the Agreements, and no proximately caused damages.

In order to prove a claim for tortious interference with contract, a plaintiff must prove "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *See Lama Holding*

---

[5] Coffey and Villency also advised Peloton of the purchase of the Patent immediately after it was assigned to VR Optics and offered to license it to Peloton before anyone else. Even at that point, before this litigation began, Peloton declined. (*See* R.56.1 ¶¶ 122-123.) Whatever damage Peloton claims, Peloton brought on itself.

*Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996). As discussed above, VDG did not breach the Agreements and, therefore, neither VRO, Coffey nor Villency tortiously interfered with the Agreements. Further, even if the representation that the Bike Intellectual Property did not infringe any existing intellectual property were not true, neither Coffey, Villency, nor VRO caused that alleged breach. The '513 Patent exists, and the Peloton Bike and Tread infringe the Patent, no matter whether VRO or someone else had bought the Patent and asserted it. Buying and asserting the Patent was not the cause of any alleged breach of contract. *See, e.g., State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (noting that that defendant's actions must be the "proximate cause" of the breach of contract). Moreover, Peloton would owe compensation to whoever owns the '513 Patent, be it VRO or anyone else, and cannot establish damages proximately caused by any tortious interference. *See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 65 (S.D.N.Y. 2016) (holding that plaintiff must prove "damages proximately caused by the Defendant's conduct"). Therefore, VRO, Coffey and Villency are entitled to summary judgment on the claim for tortious interference with contract.

## CONCLUSION

For the reasons stated above, Third-Party Defendants respectfully request that the Court enter summary judgment in their favor and against Peloton on all of Peloton's third-party claims. Further, VRO respectfully requests that the Court enter summary judgment in its favor and against Peloton on Peloton's third counterclaim for intentional interference with contractual relationship.

Respectfully submitted,

 s/ Paul S. Doherty III_____
Paul S. Doherty III, Esq.
Mark A. Berman, Esq.
Jeremy B. Stein, Esq.
Janel Alania, Esq.
**HARTMANN DOHERTY ROSA
BERMAN & BULBULIA, LLC**
800 Third Avenue, 28th Fl.
New York, NY 10022
 (212) 344-4619
pdoherty@hdrbb.com

*Attorneys for Plaintiff and Third-Party
Defendants*

Dated: July 1, 2019