# EXHIBIT I

# LITIGATION SERVICES HANDBOOK

## Fifth Edition

## The Role of the Financial Expert

Roman L. Weil
Daniel G. Lentz
David P. Hoffman

Copyright © 2012 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the Web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at http://www.wiley.com/go/permissions.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books. For more information about Wiley products, visit our web site at www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*
Litigation services handbook : the role of the financial expert / [edited by] Roman L. Weil, Daniel G. Lentz, David P. Hoffman.—5th ed.
p. cm.
Includes bibliographical references and index.
ISBN 978-1-118-11639-5 (hardback); ISBN 978-1-118-22441-0 (ebk.);
ISBN 978-1-118-23740-3 (ebk.); ISBN 978-1-118-26253-5 (ebk.)
1. Forensic accounting—United States. 2. Evidence, Expert—United States.
I. Weil, Roman L. II. Lentz, Daniel G. III. Hoffman, David P.
KF8968.15.L57 2012
347.73'67—dc23

2012008094

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

available to the infringer. These would tend to dominate any negotiation and influence the expert's economic analysis of the remaining *Georgia-Pacific* factors, and thus become crucial to establishing what the parties would have agreed to. The decision in *Grain Processing* addresses this factor by explicitly stating that a fair and accurate reconstruction of the but-for market also must take into account, where relevant, alternative actions that the infringer foreseeably would have undertaken had it not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the but-for marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner. Moreover, only by comparing the patented invention to its next best available alternative(s)—regardless of whether the alternative(s) were actually produced and sold during the infringement—can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented it from taking full economic advantage of this right.[65]

This concept summarizes the approach required of an expert, who needs to describe a realistic but-for marketplace that includes the defendant's likely lawful behavior. Damages analyses in other areas of the law use such analyses. The practitioner should confer with counsel and technical experts to help discern the incremental value attributed to the invention over the next best alternative, especially where the technology described by the patent(s)-in-suit is complex or esoteric.

As in other areas of the law, one would not expect the court to require a patentee to consider and rule out every possible response by the infringer. Thus, the expert should identify the lawful responses and select the most likely ones to consider. Some obvious behaviors include inventing around the patent, selecting a different and perhaps inferior feature, or eliminating the patented feature altogether. Others include not offering the product at all and employing the resources elsewhere.[66]

An analysis of alternatives addresses legal issues involving the scope of the patent and technical issues regarding the feasibility and cost of noninfringing alternatives, both of which will likely fall outside the scope of the damages expert's professional expertise. Consequently, damages experts often rely on expert testimony by others. Damages experts should make clear the degree to which their opinion rests on such testimony.

**(e) The Time of the Negotiation.** *Panduit* and the cases that address the issue of timing generally place the negotiations at the time of the first infringement. This is often unrealistic because no company would develop a product, build the facilities to produce it, and commit itself to launching the product before negotiating the necessary licenses. Waiting until the last minute would place the infringer in an untenable position. Because case law stipulates a hypothetical situation in which neither party faces coercion, the expert should not consider the pressures that would arise from a last-minute negotiation.

The related issues of timing and coercion present some of the most difficult subjects of the hypothetical negotiation. On one hand, the *Georgia-Pacific*

hypothetical negotiation calls for willing parties. On the other, setting the negotiation at the date of first infringement (or in some cases, a later date of notice) can place the infringer in a must-license position. Some patent owners have excluded investment costs from their calculations of the infringer's profits on the grounds that these are sunk costs at the time of the hypothetical negotiation. Others have argued for unusually high royalty rates on the grounds that the infringer dare not cut off supplies to customers who have come to rely on the infringing products. Because these factors are not present in a conventional royalty negotiation, introducing them reduces the validity and analytical value of hypothetical negotiations. Unfortunately, no case law gives guidance on this important consideration of the hypothetical negotiation.[67]

The timing of the negotiations also becomes important because it can affect the parties' perceptions of their positions, which in turn can affect the royalties they would agree to. When perceptions have changed over time, the parties will likely dispute the timing of the hypothetical negotiation. If the evidence permits, the analysis should consider each party's view of the market, the expected profitability of the patented item, and other benefits at the time of the infringement and at the most likely time that the parties would have negotiated. To the extent that analysts believe that the choice of the relevant date would significantly affect the negotiated royalty rate, they may want to clarify this dependence, as well as the date(s) used in their analyses.

Analysts most often approach the parties' perceptions through a review of past policies and behavior and contemporaneous documents. Ideally, discovery would reveal reliable projections, memoranda, market research, competitive analysis reports, project evaluation techniques, and decision factors such as rates of return and hurdle rates that measure the profitability percentage that a company desires to earn. Also, any documents that suggest either party's view of the invention's value will help the analyst, who can also search relevant trade journals, newspapers, and business periodicals to reconstruct a party's outlook.

**(f) Advantages and Disadvantages of Licensing.** When considering the hypothetical license, the patentee and licensee consider benefits and disadvantages for such an arrangement, including those listed in this section.

**Benefits of licensing for the patentee:**

- Licensing can exploit an invention more quickly and can expand the total market for the invention. This usually becomes the case if the licensee has greater resources and skills than the patentee. Such complementary assets include tangible assets such as specialized production facilities and distribution systems, as well as intangibles such as market leadership and reputation.
- If the potential licensee could lawfully enter the market by using a noninfringing alternative, the patentee can expect to lose sales anyway. Licensing, then, presents a way for the patentee to at least capture some revenue on the lost sales.
- Because royalties increase the patentee's own profits and decrease the infringer's profits, licensing can give the patentee a financial advantage over a competitor.